**Wilfredo REYES and Bernardita Reyes, Plaintiffs–Appellants,**

v.

**ATLANTIC RICHFIELD COMPANY, ARCO Petroleum Products Co., Terry Firestone, Edward Loza, T.R. Murphy, Nancy Dicks, Cynthia Weston, and Does 1 through 200, inclusive, Defendants–Appellees.**

No. 91–56106.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 6, 1992.

Decided Dec. 8, 1993.

Cheryl Shensa and Louis E. Goebel (argued), Goebel & Shensa, San Diego, CA, for plaintiffs-appellants.

Katharine C. Sheehan and Diann H. Kim (argued), Tuttle & Taylor, Los Angeles, CA, for defendants-appellees.

Before: D.W. NELSON, and REINHARDT, Circuit Judges, and CALLISTER, District Judge.*

CALLISTER, Senior District Judge:

Franchisees of an Atlantic Richfield Company (ARCO) gas station and convenience store sued ARCO when their franchise was not renewed.[1] The District Court granted summary judgment to ARCO, and the franchisees appealed. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1986, the appellants, Wilfredo Reyes, and his wife, Bernardita, wanted to purchase a franchise for an existing ARCO gas station and convenience store from Mohammad Attiyeh. The appellants agreed to pay $305,-000.00, consisting of $270,000.00 for assignment of Attiyeh's franchise with ARCO, and $35,000.00 for inventory.

The assignment of Attiyeh's franchise agreement to the appellants was contingent on ARCO's approval of the appellants as franchisees. Wilfredo Reyes enrolled in an ARCO dealer's school and completed his training in July 1986. He passed even though he displayed no aptitude for bookkeeping. The school instructors warned ARCO's sales representative that Reyes would need help with bookkeeping.

On August 18, 1986, ARCO gave its permission for the appellants to assume the franchise. The next day, the appellants, Attiyeh, and ARCO's district manager Terry Firestone, met to close the transaction. Before escrow closed, Firestone advised the appellants that ARCO had purchased a chain of gas stations, including one across the street from Attiyeh's station, and planned to convert the chain to ARCO gas stations and convenience stores. He offered to let the appellants back out of the deal. After discussing the matter in private, the appellants decided to go ahead with the purchase, and the deal then proceeded to close.

About a month later, in mid-September 1986, ARCO sales representative Edward Loza found that the appellants had not done any accounting over the preceding month. There is no dispute that the franchise agreement required that the appellants keep the books accurate and up-to-date.

The appellants do not dispute that they received notices, some by certified mail, almost every month between September 1986 and May 1987, warning them that their bookkeeping was inadequate and constituted a violation of the terms of the franchise agreement. ARCO conducted two audits between September 1986 and February 1987 which revealed that the books were not accurate and were not in conformance with ARCO's requirements.

On May 15, 1987, ARCO sent a certified letter to the appellants notifying them that a third audit would be held on the appellants' premises on May 21, 1987, and warned the appellants that "if your books and records are not complete and accurate and in conformance with ARCO's requirements, steps will be taken to terminate or non-renew your franchise, as appropriate."

The May 21, 1987, audit could not be performed because the books were not complete and were not on the premises. By letter dated June 9, 1987, ARCO notified the appellants that their franchise would not be renewed when it expired September 11, 1987.

In July 1987, after the appellants had been notified of the non-renewal, they submitted to ARCO a request to transfer their franchise to Kevin Tapia. There were only six weeks remaining on the appellants' franchise, and ARCO consented to Tapia taking over for that six-week period only if he acknowledged in writing that the franchise agreement would expire on September 11, 1987. ARCO would not make any further commitment at that time to renew the franchise for the appellants or to give prospective franchisee Tapia any additional time. Nothing further was done by Tapia or the appellants.

---

* The Honorable Marion J. Callister, Senior United States District Judge for the District of Idaho, sitting by designation.

1. The parties have referred to defendants/appellees collectively as "ARCO" and we will do likewise.

In July 1987, the appellants ceased stocking the store with new merchandise. They allowed the required insurance on the store to expire for non-payment of premiums effective August 11, 1987. Wilfredo Reyes himself returned to his former employment, but alleges that he kept family members operating the store. By letter dated August 11, 1987, ARCO told the appellants that they had effectively abandoned the store, and that the termination date was therefore advanced to August 11, 1987.

The appellants responded by filing this suit containing the following causes of action: (1) fraud; (2) negligent misrepresentation; (3) violation of the California Franchise Investment Act; (4) violation of California's Unruh Act; (5) negligent interference with economic advantage; (6) intentional interference with economic advantage; (7) negligent infliction of emotional distress; (8) intentional infliction of emotional distress; and (9) violation of the Petroleum Marketing Practices Act. The District Court granted summary judgment on all claims. The appellants appeal.

### STANDARD OF REVIEW

■ The grant of summary judgment is reviewed *de novo. Retseig Corp. v. ARCO Petroleum Products Co.,* 870 F.2d 1495 (9th Cir.1989). In assessing the evidence in the record, we must view the facts in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### ANALYSIS

To determine if the grant of summary judgment was appropriate, we will examine each of the nine causes of action dismissed by the District Court.

### Petroleum Marketing Practices Act:

■ Congress passed the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. §§ 2801–2841, in 1978 to protect gasoline industry franchisees from "arbitrary or discriminatory termination or non-renewal of their franchise." S.Rep. No. 731, 95th Cong.,

2d Sess. 15 (1978), *reprinted in* 1978 U.S.C.C.A.N. 873, 874. To accomplish this goal, the PMPA limits the reasons for which a franchisee could lose his franchise. 15 U.S.C. § 2803(a). The PMPA approves three main circumstances where non-renewal or termination is justified. First, the franchisee could lose his or her franchise for failing "to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship." 15 U.S.C. § 2802(b)(2)(A). Second, termination or non-renewal is justified if the franchisee fails to make a good-faith effort to carry out any provision of the contract "without consideration of the reasonableness of the term as long as the franchisee is given an opportunity to comply with the term in question." *O'Shea v. Amoco,* 886 F.2d 584, 595; See 15 U.S.C. § 2802(b)(2)(B). Finally, the termination or non-renewal is also justified upon "the occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or non-renewal of the franchise relationship is reasonable." 15 U.S.C. § 2802(b)(2)(C). The PMPA provides a non-exhaustive list of examples of such occurrences under sub-section (C) including fraud or criminal conduct by the franchisee, and failure by the franchisee to make timely payments of sums owing to the franchisor. 15 U.S.C. §§ 2802(c)(1), 2802(c)(8).

■ It is undisputed in this case that the franchise agreement required the appellants to keep accurate and up-to-date financial records, and that these terms were "reasonable" and "material" as required by section 2802(b)(2)(A). For almost a year, ARCO sent monthly warnings to the appellants advising them that their bookkeeping was inadequate and needed to be improved. The appellants have not come forward with any evidence disputing ARCO's assertion that the appellants did not maintain the books at all during the first month of operation of the store, and thereafter maintained the books in such an inadequate manner that all three audits found serious inaccuracies in accounting and violations of ARCO bookkeeping requirements.[2] In addition, the appellants do

---

**2.** The appellants assert that Arco did not help

them with their bookkeeping. The appellants do

not dispute that they ceased stocking the store with new merchandise in July 1987 and allowed the required insurance on the store to lapse, thereby effectively "abandoning" the store under the terms of the franchise agreement. These breaches gave ARCO the right to not renew appellants' franchise under section 2802(b)(2)(A).

The appellants argue, however, that racial discrimination was the real reason their franchise was not renewed. They point to three instances that reveal—they argue—the racial bias of ARCO.

The first instance concerns alleged statements by ARCO representatives that the appellants should replace their Filipino cashiers and accountants. The second instance concerns deposition testimony of Edward Loza, ARCO's sales representative, wherein he stated that ARCO was attempting to "build a file" on the appellants to justify their termination. The third instance involves the conduct of an ARCO representative who—while engaged in a heated argument with the appellants—pointed his finger at the appellants and "poked" his fist down on a cabinet.

The appellants argue that if the franchisor establishes that there was a legitimate reason under section 2802(b)(2)(A) for terminating a franchise, the franchisee is allowed to argue that the real reason for the termination was illegitimate. The appellants couch this issue in terms of ARCO's bad faith; that is, the appellants seek to impose a requirement on ARCO that it act in good faith, and argue further that the three items of evidence just discussed create issues of fact concerning whether ARCO's conduct constituted bad faith. Although section 2802(b)(2)(A) contains no such "good faith" requirement, the appellants argue that it is required to effectuate the purposes of the PMPA to protect franchisees from arbitrary discrimination.

■ ARCO responds by citing cases where other circuits have been unwilling to read a "good faith" requirement into sections of the PMPA where the term does not exist. *Hinkleman v. Shell Oil Co.,* 962 F.2d 372 (4th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 831, 121 L.Ed.2d 701 (1992); *Clinkscales v. Chevron USA, Inc.,* 831 F.2d 1565 (11th Cir.1987); *Russo v. Texaco,* 808 F.2d 221 (2nd Cir.1986). We need not decide, however, whether the PMPA imposes an implicit good faith requirement in section 2802(b)(2)(A) for under the explicit language of the statute a franchisor must not only show that there was a legitimate reason for the termination or nonrenewal, he must also demonstrate that this reason was in fact the ground for the termination or non-renewal decision.

■ Under the PMPA, the franchisee has the initial burden of proving that his franchise was not renewed. 15 U.S.C. § 2805(c). The burden then shifts to the franchisor to demonstrate that the non-renewal was proper under the PMPA. The PMPA prohibits the termination or non-renewal of any gasoline industry franchise unless "such termination is based upon a ground" described in the PMPA. 15 U.S.C. § 2802(b)(1)(B). One of those grounds is that the franchisee has breached a term that is both reasonable and of material significance to the franchise. ARCO established this breach as a matter of law. ARCO asserts that by establishing the breach, it has satisfied its entire burden.

But under the language of section 2802(b)(1)(B), Arco is only half done; in addition to the breach, ARCO must also establish that the "termination [or non-renewal] *is based upon*" the breach. (Emphasis added.) This second-half of the franchisor's burden is met by introducing evidence that the non-renewal was in fact based on the breach.

■ The next question is whether the franchisee is free to rebut this element of the

not, however, cite any provision of the franchise agreement that mandates such assistance. The appellants point out that section 2802(b)(2)(B) of the PMPA requires the franchisor to give the franchisee "an opportunity to comply with the term in question." They argue that non-renewal could not proceed under that provision unless ARCO provided bookkeeping help. Because the

discussion in the text above will establish that the non-renewal was proper under section 2802(b)(2)(A), we need not discuss section 2802(b)(2)(B). Appellants do not argue that section 2802(b)(2)(A) contains language requiring bookkeeping assistance, and we find none therein.

franchisor's case by producing evidence that the termination was in fact based on an illegitimate reason. The answer is yes. There is no provision in the PMPA providing that the franchisor's proof of this element creates an irrebuttable presumption. Without that, we see no reason to depart from the well-established principle that each element that one side must prove to prevail is subject to rebuttal by his or her opponent. Under this straightforward reading of the PMPA, a franchisee who claimed that he was terminated on racial grounds would be free to introduce evidence to rebut the franchisor's claim that the termination was based on a breach of a material term in the franchise agreement.

■ In this case, ARCO bears the burden of proving that the non-renewal was based on appellants' poor bookkeeping and abandonment. ARCO's evidence on this issue is exhaustive and persuasive. In rebuttal, the appellants offered evidence to establish that the breach was only a pretext for not renewing the franchise and that the real reason ARCO failed to renew appellants' franchise agreement was racial bias.

Much of appellants' evidence fails to create an issue about ARCO's racial bias. Appellants presented evidence of threatening conduct by an ARCO representative when, in an argument with appellants, he pointed his finger at them and "poked" his fist on the top of a cabinet. As the District Court found, there was no evidence that the "threatening behavior" of the ARCO representative was racially motivated. It is undisputed that the heated argument was over the appellants' poor bookkeeping, and the appellants have not introduced any evidence that the argument involved racial slurs or any reference to race whatsoever. Second, appellants introduced evidence that ARCO decided to document appellants' shortcomings in regard to their bookkeeping after the abysmal condition of the books was discovered. Nothing in the PMPA or the franchise agreement prevents the franchisor from documenting the franchisee's shortcomings after discovering that the franchisee failed to keep books for a month, and thereafter continually failed to satisfy auditors. None of the evidence of ARCO's

documentation suggested that it was motivated by racial bias.

There are, however, bits of evidence that point to racial bias on the part of ARCO. Appellants assert that ARCO representative Terry Firestone told them to replace their Filipino cashiers and accountants with white cashiers and that Edward Lopez told them that he did not like Filipinos doing the bookkeeping. Appellants also allege that at two different times, ARCO representatives suggested they "fire the Arabs." Appellants argue that this is evidence of a general racial bias.

While these comments, if true, are both contemptible and probative of ARCO's bias against appellants, they do not create a genuine issue in *this* case about whether ARCO's proffered reason for terminating the franchise was merely pretextual and thus whether ARCO's real motive in terminating the franchise agreement was racial bias. ARCO introduced substantial evidence that appellants allowed the insurance policies to lapse, ceased stocking new goods, and kept the financial records in a state of chaos. The appellants, in turn, introduced no evidence to suggest that when a non-minority franchisee breached a term of the franchise agreement in a similar manner, ARCO refrained from terminating the franchise agreement and overlooked the bookkeeping deficiencies. *See, e.g., Sischo–Nownejad v. Merced Community College Dist.,* 934 F.2d 1104, 1112 (9th Cir.1991) ("the fact that stereotyped remarks were made by [appellant's] superiors *at the same time* that they were subjecting her to less favorable working conditions is sufficient" to make out a *prima facie* case of discrimination) (emphasis supplied); *Lowe v. City of Monrovia,* 775 F.2d 998, 1009 (9th Cir.), *as amended,* 784 F.2d 1407 (9th Cir. 1985) (evidence of disparate treatment "necessarily" raises a genuine issue of material fact). Not only did the appellants fail to produce evidence of disparate treatment, there was evidence that ARCO overlooked the appellants' breach for a long period of time and instead sent them repeated notices asking them to correct the problem. The appellants have failed to cast doubt upon the

believability of ARCO's proffered reason for termination or upon its motive.

■ We observe that possibly appellants' allegations could be characterized as a mixed motive claim. Indeed, this appears to be the crux of their argument. Although the appellants do not dispute that they were in breach, they rebut ARCO's evidence by arguing that there is an issue about whether ARCO's racial bias against them also played a part in ARCO's decision to terminate. To avoid summary judgment under this theory, the burdens are slightly different. A plaintiff must show "that it is more likely than not that a protected characteristic played a motivating part" in ARCO's decision. *Sischo-Nownejad*, 934 F.2d at 1110 (internal quotations omitted). Once that is done, ARCO can "escape liability only by proving ... that the [franchise] decision would have been the same even if the characteristic had played no role." *Id.* We think ARCO has met this burden and that the appellants have failed to meet their corollary burden of creating a genuine issue about whether ARCO's decision would have been any different absent its obvious racial bias against appellants. We therefore affirm the District Court's decision dismissing the PMPA claim.

***Unruh Act:***

■ The Unruh Civil Rights Act prohibits discrimination of any kind against any person in any business establishment, including discrimination in granting of franchises. California Civil Code §§ 51, 51.8 (West Supp. 1993). The appellants assert that the same three instances of racially motivated conduct by ARCO representatives discussed in the PMPA portion of the case also apply to this Unruh Act claim. In addition, the appellants also assert that "unfounded notices of default" provide more evidence of racially biased conduct by ARCO.

The appellants have not produced any evidence, however, that the notices of default they received were unfounded. On the contrary, the undisputed evidence indicates that the notices of default were appropriate. With regard to the other instances of alleged racial bias, we have already determined that there is really only one category of evidence

that illustrates racial bias: the statements by ARCO representatives that the appellants should replace their Filipino cashiers and accountants. If the appellants are making a claim on behalf of the accountants and cashiers, the appellants have no standing to pursue that cause of action. *Midpeninsula Citizens for Fair Housing v. Westwood Investors*, 221 Cal.App.3d 1377, 1382–86, 271 Cal. Rptr. 99, 101–04 (1990). If the appellants are asserting that this small bit of evidence could lead a reasonable jury to infer that their franchise was terminated because of their race, we have already found that the appellants have not produced sufficient evidence to preclude a summary judgment. We therefore affirm the summary judgment on the Unruh Act.

***Intentional and Negligent Infliction of Emotional Distress:***

■ To sustain a claim for intentional or negligent infliction of emotional distress, California courts require evidence of conduct so extreme and outrageous as to exceed all bounds of that usually tolerated in a civilized community. *Cervantez v. J.C. Penney Co.*, 24 Cal.3d 579, 595 P.2d 975 (1979). The District Court found the record devoid of evidence of such conduct. We have likewise searched the record in vain for evidence of such extreme and outrageous conduct. We therefore affirm the grant of summary judgment on these claims.

***California Franchise Investment Law:***

■ The California Franchise Investment Law, California Corporations Code § 31000 to § 31516 (West 1977 and Supp. 1993), imposes certain requirements on a person who offers or sells a franchise. In this case, it was Mohammad Attiyeh, not ARCO that sold the franchise to the appellants. Thus, on its face, the California Franchise Investment Law does not apply to ARCO.

But ARCO concedes that it could be liable under the Act if the appellants establish that ARCO controlled Attiyeh. The appellants, however, have failed to introduce evidence that ARCO controlled Attiyeh other than through ARCO's' exercise of its statutory

right to consent to the transfer and to collect a transfer fee. The California Corporations Code § 31102 (West 1977) specifically provides that a franchisor is not considered a party to the sale of a franchise simply because the franchisor had the power to approve or reject the new franchisee. In addition, California Business and Professions Code § 21148 (West 1987) provides that a franchisor has the right to collect a transfer fee.

The Court therefore finds that the California Franchise Investment Law is inapplicable to this case.

### Fraud and Negligent Misrepresentation:

The appellants' briefing on this issue is very confusing, but it appears that they claim that ARCO committed fraud/misrepresentation once by commission and once by omission. The two alleged misrepresentations are as follows: (1) ARCO district manager Terry Firestone waited until the day of closing to inform the appellants about ARCO's purchase of the gas station across the street, and then encouraged the appellants to go forward because the competition would, according to Firestone, actually boost sales; and (2) Firestone never revealed that Mohammad Attiyeh's books were inaccurate; that Attiyeh had put off an auditor for months; that there were discrepancies in gross profit margins; and that Attiyeh had been skimming $60.00 to $80.00 a day since 1984.

With regard to the first misrepresentation, it is undisputed that Firestone informed the appellants—prior to the signing of the closing documents—that ARCO might put a competing station and store across the street. The appellants then conferred privately, reached a decision to go ahead, and communicated their assent to Firestone. The record establishes that the competing store was never built. These circumstances do not create a claim for misrepresentation.

Turning to the second misrepresentation—a misrepresentation by silence or omission—the appellants argue that ARCO had a duty to reveal Attiyeh's alleged misdeeds. ARCO responds that it was not a party to the deal between Attiyeh and the appellants and therefore had no duty to reveal the problems with Attiyeh's bookkeeping.

In a business transaction, a duty of disclosure exists if there is a fiduciary or other similar relationship of trust and confidence between the parties. *Cicone v. URS Corp.*, 183 Cal.App.3d 194, 227 Cal.Rptr. 887 (1986); Restatement (Second) of Torts § 551(2)(a) (1977). But the appellants cite no authority that a franchisor and a *prospective* franchisee enjoy a fiduciary or similar relationship during negotiations between the existing franchisee and the prospective franchisee prior to the time that the franchisor has approved the prospective franchisee. There is no evidence to indicate that the pre-approval relationship between ARCO and the appellants was anything other than an arms-length business transaction. Under these circumstances, ARCO had no duty of disclosure.

If ARCO was not silent, but instead made representations about the store's potential profitability based on past performance, ARCO would then have a duty to disclose Attiyeh's poor bookkeeping regardless of whether a confidential or fiduciary relationship existed between ARCO and the appellants. *See Cicone v. URS Corp., supra;* Restatement (Second) of Torts, *supra.* The appellants did not discuss this issue at all in their briefing to us. We do note that the appellants' complaint does assert that ARCO represented that the store was "profitable." ARCO denies making any such representation, and appellants have failed to produce any evidence that ARCO representatives made such representations. The misrepresentation and fraud claims must therefore be dismissed. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### Intentional and Negligent Interference with Economic Advantage:

The appellants claim that ARCO intentionally and negligently interfered with their economic advantage in two ways: (1) ARCO drove away prospective franchise purchaser Kevin Tapia; and (2) ARCO interfered with the appellants' ability to earn profits from their customers.

The District Court found a complete absence of any evidence to support the second alleged interference listed above. In this appeal, the appellants do not identify any evidence supporting the claim. The grant of summary judgment on this issue must therefore be affirmed.

This leaves the claim that ARCO interfered with the appellants' potential sale to Tapia. The only alleged interference consists of ARCO requiring Tapia to be notified in writing that the franchise would terminate September 11, 1987.

It is clear that ARCO has a right to assert its legally protected interests. This principle is set forth in Restatement (Second) of Torts § 773 (1977):

> One who, by asserting in good faith a legally protected interest of his own ... intentionally causes a third person not to enter into a prospective contractual relation with another does not interfere improperly with the other's relation if the actor believes that his interest may
>
> otherwise be impaired or destroyed by the performance of the contract or transaction.

ARCO was certainly justified in believing that its interests might be impaired if the franchise was transferred to a buyer who was not aware that the franchise would soon expire. Under this circumstance, the District Court's decision must be affirmed.

### CONCLUSION

In conclusion, we affirm the decision of the District Court granting summary judgment to ARCO on all claims.

**AFFIRMED.**

REINHARDT, Circuit Judge, dissenting:

We are required to defer to the factfinder in discrimination cases in which the defendant's motive is at issue. Issues of motive, therefore, may not be decided on summary judgment. Because ARCO's motive was at issue in this case, and because the majority holds that it was properly resolved on summary judgment, I dissent.

I do not think it matters whether we classify the Reyeses' claims as disparate treatment, mixed motive, or both. There is evidence in the record of racial bias on ARCO's part. The issue is whether that bias provided the motive for the failure to renew the Reyeses' franchise.

Both Supreme Court precedent and our own case law emphasize that questions of motive are for the jury to decide. *See, e.g., St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993); *Sischo–Nownejad v. Merced Community College Dist.,* 934 F.2d 1104, 1111 (9th Cir.1991); *Lowe v. City of Monrovia,* 775 F.2d 998, 1008 (9th Cir.1985), *as amended,* 784 F.2d 1407 (9th Cir.1986). We have stated that the ultimate question whether the employer's act was motivated by bias "can only be resolved through a 'searching inquiry'—one that is most appropriately conducted by the fact-finder, upon a full record." *Sischo–Nownejad,* 934 F.2d at 1111. Such a careful, intensive inquiry is necessary because an employer's intent to discriminate is "a pure question of fact." *Pullman–Standard v. Swint,* 456 U.S. 273, 287–88, 102 S.Ct. 1781, 1789–90, 72 L.Ed.2d 66 (1982); *see also St. Mary's Honor Center,* —— U.S. at ——, 113 S.Ct. at 2749, *Sischo–Nownejad,* 934 F.2d at 1111, *Lowe,* 775 F.2d at 1008. Ordinarily, in cases of this nature, the question of motive is simply not appropriately decided on summary judgment. The factfinder must be permitted to consider the evidence of discriminatory intent. *Sischo–Nownejad,* 934 F.2d at 1111.

The majority states that the Reyeses presented "bits of evidence that point to racial bias on the part of ARCO." Maj. op. at 1470. The plaintiffs in both *Sischo–Nownejad* and *Lowe,* however, presented evidence of no greater order of magnitude than the Reyeses. Sischo–Nownejad was called "an old warhorse" and a "women's libber," her students were referred to as "little old ladies," and some of her courses were reassigned. 934 F.2d at 1107–08. Yet we found that enough to "raise an inference of discriminatory intent" and, therefore, enough to "create a genuine issue of material fact regarding whether the defendants' articulated reasons are pretextual." *Id.* at 1112. Lowe was told that the Monrovia police force included no

women and no African–Americans, and was encouraged to apply to the Los Angeles Police Department instead. 775 F.2d at 1009. We found that sufficient to "conclude that there is a genuine issue of material fact regarding [Monrovia's] motive in failing to hire Lowe." *Id.* (footnote omitted). Here, supervisors told the Reyeses to replace their Filipino cashiers with white cashiers and to "fire the Arabs," and were informed by a supervisor that he did not like Filipinos doing the bookkeeping. Maj. op. at 1470. Given that the Reyeses are Filipino, that is sufficient under *Sischo–Nownejad* and *Lowe* to raise an inference of ARCO's discriminatory motive and, therefore, to defeat summary judgment.

The Reyeses presented evidence that went directly to ARCO's motive. A reasonable inference could be drawn that ARCO acted out of racial bias. ARCO presented *its* purported reason for its action. The decision as to whom to believe was properly for a jury.

In my view, this principle—that motive is a factual question—compels the conclusion that the Reyeses should have been afforded the opportunity to present their claims to a jury. Accordingly, I dissent.