CHEVRON, U.S.A., INC., Plaintiff,

v.

Babak MEBTAHI, Defendant.

No. CV 99 08266FMC(RZX).

United States District Court,
C.D. California.

Nov. 30, 2000.

Robert C. Phelps, Richard P. Rados, Skjerven Morrill MacPherson, San Francisco, CA, for plaintiff.

Kenneth P. Roberts, John J. Stifter, IV, Kenneth P. Roberts Law Offices, Woodland Hills, CA, for defendants.

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COOPER, District Judge.

This matter is before the Court on Plaintiff's Motion for Summary Judgment filed on September 12, 2000. This matter is also before the Court on Defendant's Motion for Summary Judgment filed on September 8, 2000. For the reasons set forth below, the Court hereby **DENIES** Plaintiff's Motion for Summary Judgment and hereby **GRANTS** Defendant's Motion for Summary Judgment.

The present dispute arises out of a franchise relationship between Plaintiff Chevron, U.S.A., Inc. ("Chevron" or "Plaintiff") and Defendant Babak Mebtahi ("Mebtahi" or "Defendant"). Plaintiff seeks to terminate certain agreements between the parties and asks the Court to declare its rights under the Petroleum Marketing Practices Act of 1979 ("PMPA"), to do so. Plaintiff further seeks an order from this Court requiring Defendant to surrender to Plaintiff control of a service station located in Harbor City.[1] Defendant, for his part, also seeks to have his rights under the PMPA declared. Defendant asks the Court to enjoin Plaintiff from terminating the agreements between the parties. Both parties seek damages, attorney's fees, and costs.

### I. Uncontroverted Facts

#### A. Background: The Relationship Between the Parties and the Dealer Agreements

Chevron U.S.A., Inc. ("Chevron" or "Plaintiff") leases a Chevron brand service station located at 25800 Western Avenue, Harbor City, CA, to Defendant Babak Mebtahi ("Mebtahi" or "Defendant"). Defendant, from 1990 to 1996, worked at several Chevron service stations operated by his brother-in-law. In September, 1996, Defendant purchased his own franchise and leased the service station from Chevron.[2] In September, 1997, Plaintiff and Defendant entered into a written

---

1. Plaintiff owns the service station and has leased it to Defendant.

2. Defendant paid approximately $600,000 for the franchise. Later, in February 1998, and again in mid–1998, Defendant was offered $450,000 from Chevron's territory manager, Haywood Epperson, for the franchise. Defendant has presented evidence that his service station has been designated as "long-term strategic" by Chevron's "Strategic Network Plan." The significance of this designation is that Chevron anticipates that the service station will remain in operation for the foreseeable future. Defendant contends that because he declined to "sell back" the fran-

Dealer Lease, Dealer Supply Contract, and related agreements ("Dealer Agreements"). The Dealer Agreements were signed on or about September 3, 1997, and became effective December 1, 1997.

The Dealer Agreements established that the rent Defendant pays to Plaintiff is based on a graduated percentage of motor fuel sales and a graduated percentage of sales at the convenience store portion of the service station. Chevron determines the "convenience store" portion of the rent by monitoring sales data that are collected via "Electronic Point of Sale" equipment.[3]

Section 2(c) of the Dealer Lease requires Defendant to comply with all applicable Federal, state, and local laws and regulations. Section 4(f) of the Dealer Lease gives Chevron the right, upon 72 hours' notice, to audit all books and records relating to Defendant's operations. Section 4(e) requires Defendant to maintain books and records regarding sales information in the form specified by Chevron.

Some time prior to the September 3, 1997, execution of the Dealer Agreements, Defendant received a letter from William Berghoff that outlined a new rent program and stated that any reference to the dealer's tax returns and bank records would be deleted from the audit clause.[4]

## B. The Audit

The parties agree that the present dispute arose out of an audit of Defendant's records that Plaintiff ordered pursuant to Paragraph 4(f) of the Dealer Lease. Stephen Willer, Chevron's Manager, Dealer Affairs–Retail, described the process by which dealers are "nominated" for audit. Chevron's "Dealer Affairs" group solicited nominations of Chevron lessee dealers to be audited. Retail Marketing Managers (later called Retail Team Leaders) nominated dealers within their geographic areas of responsibility. Generally, each Retail Marketing Manager nominated two dealers per quarter to be audited. Significantly, only stations that pay rent as a percentage of sales are subject to audit.

Defendant's business was to be audited because rent was determined as a percentage of sales, because sales data were collected by Chevron via "Electronic Point of Sale" equipment, and because Chevron expected the Defendant to be engaging in a larger volume of sales than the rent payments reflected.

In April, 1999, Chevron's independent auditor, Carson & Associates, performed an audit of Defendant's records regarding the service station. Plaintiff was not present at the audit. The auditors issued a report to Chevron dated May 15, 1999. The audit concluded that Defendant had under-reported and underpaid his sales tax for 1998 by several thousand dollars. The report also noted several records were not provided, including federal income tax returns for 1998 and state sales tax returns. The report did not conclude that Defendant failed to pay all the rent due to Plaintiff.[5]

chise to Plaintiff, Plaintiff "retaliated" by ordering an audit that led to the present dispute. Plaintiff's Vice President of Marketing is quoted in the Wall Street Journal as saying: "It's all about return on investment. The costs of the business do not have to include the profit to the dealer." Alexi Barrionuevo, "Service Stations Muddle Merger of Exxon, Mobil," *Wall Street Journal*, Nov. 22, 1999, at B1.

3. Defendant is not alleged to have tampered with this equipment, nor is he alleged to have attempted to misrepresent to Plaintiff the amount of rent due to Plaintiff.

4. These provisions appear to have been incorporated into the Dealer Agreements. Section 4(f), the "Right to Audit" clause, contains no reference to tax returns or bank records.

5. Whether Defendant paid the appropriate rent is irrelevant to the present inquiry. The

## C. The Decision to Terminate

Chevron's employee, Stephen Willer on or about August 7, 1999, issued a Termination Notice to Defendant, stating that Chevron intended to terminate the Dealer Agreements based on: 1) Defendant's failure to maintain or produce for audit his state and federal income tax returns; 2) Defendant's failure to comply with the law in filing his sales tax returns; and 3) Defendant's "unlawful, fraudulent, and deceptive" failure to properly report all of his sales to the relevant taxing authorities. The Termination Notice stated that Defendant's franchise would terminate ninety days after Defendant's receipt of the notice.[6]

Willer did not discuss this decision to terminate the Dealer Agreements with anyone else at Chevron. Prior to issuing the termination notice, Willer had not met Defendant nor had Willer visited Defendant's operations.

## D. Defendant's Payment of Sales Taxes

Defendant explains the admitted underreporting and underpayment of his sales tax in 1998. During the first years of his operations Defendant paid sales taxes by approximating the amount he owed rather than by actually calculating it. Sometime before 1998, Defendant was advised by his accountant that he was paying too much in sales taxes. (Daneshmand Dep. 111–112.) Defendant was advised that he could either seek a refund from the State Equalization Board or understate his current sales taxes to recoup the overpayment. (*Id.*) Because seeking a refund would result in an audit and the accompanying inconveniences, Defendant chose the latter method, one which his accountant later stated was not the best advice. (*Id.*)

Defendant had, in fact, overpaid his prior years' sales tax, as confirmed by an audit by the State Board of Equalization. After receiving the Notice of Termination, Defendant requested a formal audit of his service station by the California Board of Equalization in order to request a refund of overpaid taxes. The California State Board of Equalization audited Defendant's operations for the period from October 1996 through June 1999.[7] That audit concluded that Defendant was due a refund and Defendant was issued a sales tax refund in the amount of approximately $2,600 after the State Board of Equalization.

## E. Parties' Positions

Chevron seeks to terminate the franchise because Defendant failed to comply with applicable tax laws. Defendant contends that the Petroleum Marketing Practices Act precludes such termination because the Defendant did not violate a material provision of the Dealer Agreements.

Specifically, the parties assert the following claims seeking declaratory relief, injunctive relief, damages, attorney's fees, and costs. Plaintiff seeks a declaration of its rights under the PMPA to terminate the Dealer Agreements pursuant to 15 U.S.C. §§ 2802(b)(2)(A), 2802(b)(2)(C), and 2802(c)(11), asks the Court to find that

---

reasons for termination must be set forth in the termination notice. *See* 15 U.S.C. § 2802. Plaintiff did not state that nonpayment or underpayment of rent was a reason for termination.

**6.** This notice is required by statute. *See* 15 U.S.C. § 2804.

**7.** Plaintiff contends that Defendant should have notified the State Board of Equalization that he engaged in "self-help" measures to correct previous overpayments. While the testimony of Norman Rice, bears out that the State Board of Equalization practice is to be forgiving of mere mistakes, the Board's practice regarding intentional underreporting is not so generous. (Rice Depo. at 66–67).

Defendant has breached a material term of the Dealer Agreement, and seeks an Order compelling Defendant to surrender control of the service station to Plaintiff. Additionally, Plaintiff seeks damages for breach of contract.

Defendant asserts a counterclaim for damages, attorney's fees, and costs, based on violations of the PMPA. Defendant also seeks declaratory relief under the PMPA; specifically, Defendant seeks declaration of his rights and liabilities under the PMPA, asks this Court to find that no material breach has been committed, and seeks an Order precluding Plaintiff from revoking the Dealer Agreements. Defendant further seeks an injunction under California Bus. & Prof.Code § 17200.

## II. Summary Judgment Standard

Summary judgment is proper only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. Rule Civ. Pro. 56(c); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Whether a fact is material is determined by looking to the governing substantive law; if the fact may affect the outcome, it is material. *Id.* at 248, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202.

If the moving party meets its initial burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genu-

ine issue for trial." Fed.R.Civ.P. 56(e). Mere disagreement or the bald assertion that a genuine issue of material fact exists does not preclude the use of summary judgment. *Harper v. Wallingford*, 877 F.2d 728 (9th Cir.1989).

The Court construes all evidence and reasonable inferences drawn therefrom in favor of the non-moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Brookside Assocs. v. Rifkin*, 49 F.3d 490, 492–93 (9th Cir.1995).

## III. The PMPA Precludes Termination of the Dealer Agreements

Both parties seek damages, declaratory relief, injunctive relief, attorney's fees, and costs under the PMPA. A determination of the parties' rights under the PMPA focuses on a single inquiry: Was Plaintiff's termination of the Dealer Agreements proper?

### A. Legal Standard

Congress enacted Title I of the PMPA in 1978, 15 U.S.C. §§ 2801—2841, with the stated purpose of protecting franchisees and consumers from exploitation by large petroleum companies and equalizing the bargaining power between the petroleum companies and the franchisees. S.Rep. No. 731–95, U.S.Code Cong. & Admin.News 873, 875–877 (1978) ("Senate Report"). The overriding purpose of the PMPA is to protect the franchisee's reasonable expectation of continuing the franchise relationship. *Unocal Corp. v. Kaabipour*, 177 F.3d 755 (9th Cir.1999), *cert. denied*, 528 U.S. 1061, 120 S.Ct. 614, 145 L.Ed.2d 509 (1999). To that end, the terms of the PMPA are to be liberally construed to protect the franchisees. *Id.*

In relevant part, the PMPA's general prohibition provision against termination provides:

> Except as provided in subsection (b) of this section ..., no franchisor engaged in the sale, consignment, or distribution

of motor fuel in commerce may (1) terminate any franchise (entered into or renewed on or after June 19, 1978) prior to the conclusion of the term, or the expiration date, stated in the franchise . . . .

15 U.S.C. § 2802(a). § 2802(a) also requires that a franchisor comply with certain notice provisions set forth in § 2804. Although the PMPA generally prohibits the termination of franchise agreements before the term of the agreement expires, a franchisor may terminate a franchise if one of the grounds to terminate the franchise set forth in 15 U.S.C. § 2802(b)(2) applies.

Plaintiff argues that termination of the Dealer Agreements are proper under two exceptions to the PMPA's general prohibition against termination: § 2802(b)(2)(A) and (b)(2)(C), which provide:

> [ (b) ]   (2) For purposes of this subsection, the following are grounds for termination of a franchise or nonrenewal of a franchise relationship:
>
> (A) A failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship . . . .
>
> . . . .
>
> (C) The occurrence of *an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable* . . . .

15 U.S.C. § 2802(b)(2)(A), (C) (italics added). Section 2802(c) clarifies § 2802(b)(2)(C) by defining its key term:

> As used in subsection (b)(2)(C) of this section, the term *"an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable"* includes such events as . . . (11) knowing failure of the franchisee to comply with

Federal, State, or local laws or regulations relevant to the operation of the marketing premises . . . .

15 U.S.C. § 2802(c)(11) (italics added). Section 2802(c)(11)'s term "knowing failure" must itself be viewed in light of the PMPA's definition of "failure," which is found in 15 U.S.C. § 2802(13): "As used in [§§ 2801—2806]: (13) The term "failure" does not include (A) any failure which is only technical or unimportant to the franchise relationship . . . ."

■   Therefore, although franchisors are entitled to reasonably expect that franchisees will comply with the provisions of the franchise agreement, the extreme remedy of termination cannot be invoked for mere technical or minor violations of the contract. *Khorenian v. Union Oil Co. of California,* 761 F.2d 533, 536 (9th Cir.1985) (citing Senate Report at 876). Termination is proper only where the contractual violation is "so serious as to undermine the entire relationship." *Khorenian,* 761 F.2d at 536 (citing Senate Report at 876). In the view of the Ninth Circuit, "Congress intended to restrict termination to contractual violations of the most serious and fundamental nature." *Khorenian,* 761 F.2d at 536. Stated otherwise, only breaches of terms that are of "real importance or great consequence to the franchise relationship" justify termination. *Doebereiner v. Sohio Oil Co.,* 893 F.2d 1275 (11th Cir.1990). In making the determination of whether termination is proper, the Court must look at the nature of the provision allegedly violated, and at the nature and effect of the alleged breach. *Khorenian,* 761 F.2d at 536.

## B. Termination Is Improper Under § 2802(b)(2)(A) Because the Breach Is Not Material to the Franchise Relationship

■   Defendant's alleged breach of the Dealer Agreements focuses almost exclu-

sively[8] on his failure to appropriately report and pay his state sales tax. This is not a term that is fundamental to the franchise relationship; nor does the term have real importance or great consequence to the relationship.

Plaintiff argues that it now cannot trust Defendant to comply with the law. Plaintiff's argument is unconvincing. The thrust of Plaintiff's argument is that the inability to trust is "so serious as to undermine the entire relationship." In its favor, Plaintiff has produced evidence that Defendant purposefully under-reported his sales tax due for 1998.

However, Plaintiff has produced no evidence to controvert Defendant's evidence that he relied on the advice of his accountant to do so. Nor has Plaintiff produced any evidence that Defendant's intent was to pay less sales tax that he was required to pay by law. Rather, the uncontroverted evidence establishes that Defendant was attempting to recoup previous overpayments of sales tax. Although the Court does not condone Defendant's "self-help" measures, the Court does not find that Defendant's actions support an inference that Defendant is untrustworthy with regard to compliance with applicable laws.

The cases cited by Plaintiff do not require a contrary result. Plaintiff relies on *Texaco Refining and Marketing, Inc. v. Davis*, 835 F.Supp. 1223, *aff'd*, 45 F.3d 437 (9th Cir.1994), *cert. denied*, 514 U.S. 1127, 115 S.Ct. 2000, 131 L.Ed.2d 1001 (1995), and *Baker v. Amoco Oil Co.*, 956 F.2d 639 (7th Cir.1992). In *Texaco*, the franchisee refused to reopen his service station from sundown on Friday through sundown on Saturday despite a court order to do so. The *Texaco* court noted that the franchisor is entitled to expect the franchisee to comply with court orders. The court upheld

the franchisor's subsequent termination of the franchise agreement, agreeing with other courts and holding that the hours of operation are material to the franchise agreement. The court found the franchisee's willful noncompliance with a court order to be significant to the determination of whether termination was proper.

Here, however, Defendant's actions were less willful than those of the franchisee in *Texaco*. The uncontroverted evidence establishes that Defendant acted on (bad) advice from his accountant. Moreover, Defendant's actions in failing to properly report his sales tax are not as crucial to the franchise relationship as were the actions of the *Texaco* franchisee in failing to keep his business open during the hours set by the franchise agreement. Texaco faced actual harm from the franchisee's actions. In *Texaco*, the Court specifically found that "the motoring public, other Texaco dealers, and Texaco have been and will continue to be irreparably harmed by the closings." Here, Plaintiff has presented no evidence that it will harmed but argues instead that termination is proper to provide assurance against further violations.

In *Baker*, the Seventh Circuit held that a franchisor can terminate a franchise agreement based on the franchisor's inability to trust the franchisee. *Baker v. Amoco Oil Co.*, 956 F.2d 639 (7th Cir.1992). In *Baker*, however, the franchisee was found to have actually cheated the franchisor out of money due to the franchisor. No such evidence is present here.

The Court is also persuaded by Defendant's argument that Plaintiff's expression of its intent to drop the reference to a franchisee's tax records in its "Right to Audit" clause is evidence that the term is

---

8. Defendant's failure to produce his federal income tax returns does not change the Court's result.

not material to the franchise relationship. Plaintiff argues that this evidence, in light of the parties' fully integrated agreement, is barred by the parol evidence rule. Plaintiff correctly notes that the parol evidence rule generally prohibits the introduction of any extrinsic evidence to vary or contradict the terms of an integrated written instrument. Cal. Civ. Pro.Code § 1856; *Masterson v. Sine,* 68 Cal.2d 222, 65 Cal.Rptr. 545, 436 P.2d 561 (1968). Nevertheless, at least one Court has suggested that, under the PMPA, a determination of whether the term of a franchise agreement is material necessarily involves an examination of the facts and circumstances surrounding the franchisee's inclusion of the provision in the franchise agreement. *Doebereiner v. Sohio Oil Co.,* 893 F.2d 1275 (11th Cir.1990). The Court views the letter received by Defendant stating that Plaintiff intended to drop the reference to franchisee's tax returns in the "Right to Audit" clause to be strong evidence that how a franchisee handles his tax reporting is not material to the franchise relationship.

Therefore, Plaintiff has failed to establish that termination of the franchise agreement is permissible under the exception set forth in § 2802(b)(2)(A).

## C.  § 2802(b)(2)(C) and (c)(11)

■ Under the PMPA, termination is justified when an event occurs that is relevant to the franchise relationship and when that event makes termination reasonable. 15 U.S.C. § 2802(b)(2)(C). Certain events have been designated by statute to fall within this category. 15 U.S.C. § 2802(c)(1)–(12). One of those statutorily designated events is the knowing "failure" of the franchisee to comply with state laws. 15 U.S.C. § 2802(c)(11). However, technical failures or failures that are unimportant to the franchise relationship do not justify termination. 15 U.S.C. § 2802(13). Therefore, the inquiry under (b)(2)(C) and

(c)(11) focuses on whether Defendant's failure to properly report his taxes is a "technical" or "unimportant" failure. This is much the same inquiry as that under (b)(2)(A), addressed in the previous section, regarding materiality.

Additionally, even upon the occurrence of an event enumerated in § 2802(c)(1)–(11), the Court must still inquire into the reasonableness of a termination of an agreement covered by the PMPA. *See Patel v. Sun Company, Inc.,* 141 F.3d 447 (3d Cir.1998) (disagreeing with franchisor's argument that there was no statutory basis for inquiry into the objective reasonableness of nonrenewal of franchise agreement under § 2802(c)(4)); *Marathon Petroleum Co. v. Pendleton,* 889 F.2d 1509, 1512 (6th Cir.1989) ("we must scrutinize the reasonableness of terminations even when an event enumerated in § 2802(c) has occurred"); *Sun Refining and Marketing Co. v. Rago,* 741 F.2d 670, 673 (3d Cir. 1984) ("we decline to construe § 2802(c) as a per se termination rule favoring franchisors").

Therefore, for the reasons stated in the previous section and in light of the standards set forth above, Plaintiff has failed to establish that termination of the franchise agreement is permissible under the exception set forth in § 2802(b)(2)(C) and (c)(11).

The case law cited by Plaintiff does not require a contrary result. Plaintiff relies on *Atlantic Richfield Co. v. Guerami,* 820 F.2d 280 (9th Cir.1987). In *Atlantic Richfield,* the Ninth Circuit determined that no inquiry into the impact on the franchise relationship was necessary where the franchisee was convicted of possession of heroin for sale. Such an event was held to be per se grounds for termination of the franchise agreement, regardless of the impact on the franchise relationship. The Ninth Circuit held that, under § 2802(c)(12), which provides for termi-

nation of the franchise agreement upon the "conviction of the franchisee of any felony involving moral turpitude," no inquiry regarding the impact on the franchise relationship was necessary. This case is distinguishable because § 2802(c)(12) does not use the term "failure", and therefore does not implicate § 2801(13)'s definition of "failure." Accordingly, the *Atlantic Richfield* court did not address the effect of § 2801(13)'s definition of "failure", which incorporates an element of materiality into § 2802(c)(11). Other cases upon which Plaintiff relies fail for the similar reasons. *See Desfosses v. Wallace Energy, Inc.,* 836 F.2d 22 (1st Cir.1987) (discussing § 2802(c)(4)); *Russo v. Texaco, Inc.,* 808 F.2d 221 (2d Cir.1986) (discussing an event not enumerated in § 2802(c)(1)–(12)).

Another line of cases upon which Plaintiff relies involves a franchisee's tax liabilities. *See Clinkscales v. Chevron, U.S.A., Inc.,* 831 F.2d 1565 (11th Cir.1987); *In re Matthews Enters. v. Shell Oil Co.,* 51 B.R. 333 (Bankr.S.D.Ind.1985); *Chevron U.S.A., Inc. v. El-Khoury,* CV 99–08265 (C.D.Cal., Nov. 7, 2000). However, all of these cases involve the failure to pay taxes, rather than the failure to properly report taxes. Here, it is undisputed that Defendant did not owe any additional taxes as a result of his underreporting in 1998.

Therefore, Plaintiff has failed to establish that termination of the franchise agreement is permissible under the exceptions set forth in § 2802(b)(2)(C) and (c)(11).

## D. Defendant Has Presented No Evidence of Bias

Defendant also advances an argument based on *Reyes v. Atlantic Richfield Co.,* 12 F.3d 1464 (9th Cir.1993). In *Reyes,* the Ninth Circuit held that a franchisee may attempt to show that, although a franchise agreement was breached, the reason for termination of the agreement was racial bias rather than the breach of the agreement. Under *Reyes,* the franchisor must show that the reason given for terminating the franchise was not pretextual. *Reyes* requires a franchisor to show not only a legitimate reason for termination of a franchise agreement, but also to show that the reason given was in fact the grounds for the termination.

The record is devoid of any evidence of discriminatory bias. However, Defendant also seems to argue that *Reyes* may be read to extend beyond discriminatory bias and that its holding should be applied to all situations where the franchisor's stated reason for terminating a franchise agreement is pretextual.

In Defendant's favor, the record contains some evidence of pretext. Defendant contends that the audit of his operations was merely a part of an overall scheme by Plaintiff to buy out dealers in strategically located and profitable stations. Plaintiff's Vice President of Marketing was quoted by the Wall Street Journal as stating that investors' returns could be increased by eliminating the franchisee's profits. Additionally, Defendant claims that he bought the business for over $600,000, that Chevron offered to buy him out for $450,000, and that they requested an audit when he refused their offer. Plaintiff then terminated the franchise agreement based on an immaterial breach discovered in an audit to determine if the rent paid to Plaintiff was correct.[9]

---

9. Plaintiff's protests that the purpose of the audit was not merely to confirm that an appropriate amount of rent was paid to it are unconvincing. Only those service stations that pay rent as a percentage of sales are subject to audit. Moreover, the Carson & Associates' audit is entitled "Rent Audit."

Nevertheless, because the Court has determined that the termination of the Dealer Agreements violates the PMPA on other grounds, the Court need not decide today whether *Reyes* should be extended to include other instances of pretext.

## IV. The Parties' State Law Claims are Preempted

### A. Plaintiff's Breach of Contract Claim is Preempted

██ The PMPA contains an express preemption provision:

> To the extent that any provision of [§§ 2801—2806] applies to the termination ... of any franchise, ... no State or any political subdivision thereof may adopt, enforce, or continue in effect any provision of any law or regulation ... with respect to termination ... of any such franchise ....

15 U.S.C. § 2806(a). The Ninth Circuit has repeatedly held that the PMPA preempts all state law that is inconsistent with the PMPA and that the PMPA was intended to preempt all state law with respect to the termination of a petroleum franchise. *Simmons v. Mobil Oil Corp.*, 29 F.3d 505 (9th Cir.1994); *Humboldt Oil Co. v. Exxon Co., U.S.A.*, 823 F.2d 373, 374–75 (9th Cir.1987) *cert. denied*, 485 U.S. 1021, 108 S.Ct. 1575, 99 L.Ed.2d 890 (1988); *In re Herbert*, 806 F.2d 889, 892 (9th Cir.1986).

Plaintiff's breach of contract claim is premised upon the same facts as, and seeks the same relief as, its claim under the PMPA. Plaintiff's breach of contract claim may be resolved only by reference to the statutory language and history of the PMPA, as well as the case law interpreting the PMPA. To the extent California con-

tract law is inconsistent with the PMPA, it must be disregarded.[10] Accordingly, Plaintiff's breach of contract claim is preempted by the PMPA.

### B. Defendant's Counter–Claim for Injunctive Relief Under California's Unfair Competition Law Is Preempted

██ In seeking relief under Cal. Bus. & Prof.Code § 17200,[11] Defendant alleges that Plaintiff's true reason for terminating the Dealer Agreements was to enable Plaintiff to acquire the service station at a price well below market value. In this regard, Defendant's state law claim focuses on the grounds for terminating the Dealer Agreements. Because the claim focuses on the grounds for terminating the Dealer Agreements, it is preempted by the PMPA.

## V. Conclusion

The Court finds that Plaintiff's termination of the Dealer Agreements is contrary to the PMPA. Therefore, Plaintiff is enjoined from terminating the Dealer Agreements.

Summary judgment in favor of Defendant is granted as to Plaintiff's first cause of action for declaratory, injunctive, and monetary relief under the PMPA. Plaintiff's claim for breach of contract is preempted by the PMPA and is therefore dismissed with prejudice.

Defendant's second counterclaim for injunctive relief under California's unfair competition law is preempted by the PMPA and is therefore dismissed with prejudice. Summary judgment in favor of

---

**10.** To the extent California contract law is consistent with the PMPA, Plaintiff's claim for breach of contract is superfluous.

**11.** This provision prohibits a broad range of unlawful, unfair or fraudulent business acts and practices, as well as unfair, deceptive, untrue or misleading advertising. Cal. Bus. & Prof.Code § 17200.

Defendant is hereby granted as to Defendant's first and third counterclaims.

Plaintiff is enjoined from terminating the Dealer Agreements on the basis of the reasons set forth in the August 7, 1999, Termination Notice. Plaintiff is further enjoined from attempting to dispossess Defendant of the service station at issue in this action.