Donald W. GEIB, d/b/a Rochester
Colonial Amoco, Plaintiff–
Appellant,

v.

AMOCO OIL COMPANY, a Maryland
corporation, Defendant–Appellee.

No. 92–2129.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 12, 1993.

Decided July 19, 1994.

Lawrence M. Dudek (briefed), Douglas E. Busbey (argued), Miller, Canfield, Paddock & Stone, Detroit, MI, for Donald W. Geib.

Richard J. Stevens, Chicago, IL, Daniel G. Wyllie, Dykema & Gossett, Detroit, MI (argued and briefed), for Amoco Oil Co.

Before MERRITT, Chief Judge; BOGGS, Circuit Judge; and ENGEL, Senior Circuit Judge.

ENGEL, Senior Circuit Judge.

Plaintiff Donald W. Geib appeals the district court's summary dismissal of his action against Defendant Amoco Oil Company. In his amended complaint, Geib alleges violations of the Petroleum Marketing Practices Act ("PMPA"),[1] the Michigan Franchise Investment Law ("MFIL"),[2] and the common law of Michigan, arising out of Amoco's refusal to renew his motor fuel sales and automotive service franchises. We AFFIRM the decision of the district court in all respects with the exception of the issues arising under the MFIL. As to those issues, we certify a question to the Supreme Court of Michigan, in the belief that these issues are important and of first impression in Michigan, and are therefore most appropriately resolved by that state's highest court. We retain jurisdiction pending resolution of the certified question.

## I. Background

Geib leased Amoco stations at various locations from 1968 to 1991. Geib operated the Rochester Colonial Amoco in Michigan from 1985 until September of 1991, at which time he relinquished control pending resolution of this suit. Geib retailed gasoline at the Rochester Colonial Amoco pursuant to a "Dealer Supply Agreement" ("DSA") which expired on June 30, 1991, and was not renewed. Geib also performed automotive repair services under Amoco's trademarks pursuant to a "Certicare Automotive Maintenance and Repair Service Franchise Agreement" ("Certicare Agreement").

Under the terms of the DSA, Geib paid Amoco rent for the use of the premises and for the use of Amoco's trademarks. Geib purchased gasoline from Amoco pursuant to a "Meter Marketing Plan" ("MMP"). The MMP provided for consignment sales of gasoline, whereby Amoco continually stocked Geib's tanks, and Geib paid Amoco only after selling the gas to retail customers. The price at which Geib purchased the gasoline was determined by the price prevailing at the time the gas was drawn from his storage tanks and pumped into automobiles. Under the MMP, Geib provided Amoco with regular reports of his gasoline inventory ("regular reports") every Tuesday and Friday. Geib also submitted special price change inventory reports ("price change reports") whenever Amoco changed the dealer's price of gas. Geib's debt to Amoco was calculated by multiplying the quantity sold, as determined by his reports, by the price of gas in effect at the time of the retail sale.

In February of 1991, Amoco began to investigate the possibility that Geib was manipulating his inventory reports to profit from fluctuations in the price of gas. Geib's scheme was relatively simple. When Amoco notified him that a *price increase* would take effect at midnight on a particular date, Geib would hesitate up to 24 hours after the price change before reading his tank meters for the price change report. This delay enabled Geib to purchase extra gasoline at the previous (lower) price. Conversely, when a *price decrease* took effect at midnight on a particular date, Geib would read his meters up to 24 hours early, so that he would purchase less gasoline at the previous (higher) price. In this fashion, Amoco calculates that Geib avoided paying the proper price for more that 82,000 gallons of gasoline, resulting in a reduction of Geib's gas bill in 1990 and 1991

---

1. 15 U.S.C. §§ 2801 *et seq.*

2. Mich.Comp.Laws Ann. §§ 445.1501 *et seq.*

of over $2,000. Geib never indicated to Amoco that the meter readings on his price change reports were not taken at the time at which the price changes were scheduled to take effect.

Having discovered that Geib was manipulating the reports, Amoco declined to renew his gas franchise after the DSA expired in June of 1991. Geib was later replaced with a different lessee at the Rochester Colonial Amoco. In his initial complaint, Geib challenged the nonrenewal of his gas franchise as a violation of the PMPA. Geib later amended his complaint to add state law claims, including a violation of the MFIL, breach of contract, fraudulent misrepresentation, and tortious interference with business relations.

## II. The PMPA Claim

The PMPA regulates the marketing of automotive fuel by "establish[ing] minimum federal standards governing the termination and nonrenewal of" motor fuel sales franchises. *May–Som Gulf, Inc. v. Chevron U.S.A., Inc.*, 869 F.2d 917, 921 (6th Cir.1989). Geib claims that Amoco's nonrenewal of his Rochester Colonial Amoco franchise violates the provisions of the PMPA which specify the only circumstances under which nonrenewal of such a franchise is permissible.

Geib is correct that the PMPA only permits a petroleum distributor like Amoco to refuse to renew a franchise under specifically defined circumstances. Under 15 U.S.C § 2802(b)(1), Amoco may only refuse to renew Geib's motor fuel sales franchise if Amoco complies with "the notification requirements" of 15 U.S.C. § 2804, and if "such nonrenewal is based upon a ground described" in 15 U.S.C. § 2802(b)(2) or (3). Amoco contends, and the district court agreed, that Amoco was entitled under the PMPA to refuse to renew Geib's franchise after he failed to pay for the gas in the manner specified by the MMP. *See* 15 U.S.C. § 2802(b)(2)(A) ("grounds for termination of a franchise or nonrenewal of a franchise relationship" include, *inter alia*, "[a] failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship").

Viewing the facts of this case in the light most favorable to Geib, we conclude that summary judgment in favor of Amoco on the PMPA claim was proper as a matter of law. Geib does not dispute Amoco's right not to renew his franchise in the event of a breach of the franchise contract. Geib also does not dispute that he repeatedly engaged in the unorthodox inventory reporting techniques described above.[3] Rather, Geib seeks to avoid summary dismissal primarily by arguing that his method of submitting price change reports was not, in fact, a breach of the MMP. Geib argues that the written contract did not mandate any particular reporting technique, and that Amoco representatives orally instructed him to adjust the timing of his reports to take advantage of price changes.

■ We turn first to Geib's contention that he did not violate any express written provisions of the MMP. Admittedly, the MMP does not specifically instruct Geib when to read his tank meters. However, the inventory reports clearly were designed to enable Amoco to invoice Geib properly for his gasoline purchases. Therefore, the contours of the reporting requirement are defined by the terms of the contract governing Geib's obligation to pay Amoco for the gasoline. The DSA unambiguously and unequivocally provides that Geib will pay for the gas at the price in effect at the time "when title to [the gasoline] passes from Amoco to Dealer." To determine at precisely what moment title to the gasoline shifts, we must refer to the MMP, which explains that "[t]itle to [the gasoline] shall remain in Amoco until the product is withdrawn from the underground

---

3. During discovery, Geib was deposed by Amoco's attorneys. The following passage appears in the transcript of that hearing:

COUNSEL FOR AMOCO: Do you agree that on a substantial number of the price change reports that you submitted to Amoco in 1990 that you used readings from either twenty-four hours before or twenty-four hours after the effective price change?

GEIB: Yes, I did.

*Geib v. Amoco Oil Co.*, No. 91–CV–72420–DT (E.D.Mich. June 3, 1991), Deposition of Donald W. Geib at 88 (hereinafter "Geib Deposition").

storage tanks by Dealer and registered on the pump meter, at which time title shall pass from Amoco to Dealer." The combined effect of these provisions is to set the price at which Geib purchases gas at the price level in effect at the time the gas is pumped from the tanks into his customers' automobiles. The language of the contract gives rise to no other possible interpretation, and Geib suggests none. In fact, Geib clearly indicated at his deposition that he understood the rationale for requiring accurate and timely reporting:

> COUNSEL FOR AMOCO: The reason you received a notice from Amoco, of a price change, was to tell you that what you're going to have to pay Amoco for gas, after the effective time of the price change, was going to be X cents a gallon; is that correct?
>
> GEIB: Correct.
>
> COUNSEL: The reason that you would prepare a price change report under those circumstances is to tell Amoco how much gas you had purchased prior to that price change, and pay for it at the old price; is that correct?
>
> GEIB: Basically.
>
> COUNSEL: That is fair and proper, correct?
>
> GEIB: Yes.
>
> COUNSEL: So that you pay for the gas at the price that was in effect when you bought it, correct?
>
> GEIB: Pretty much, yes.
>
> COUNSEL: And that the gas you buy after the price change, you're going to pay at the new price?
>
> GEIB: Correct.

Geib Deposition, *supra* note 3, at 74–75.

This deposition testimony reveals Geib's awareness that his inventory reporting technique distorted the amount he paid for gas. By delaying his reports after price increases, and by hurrying his reports before price decreases, Geib often paid less than the agreed upon price for the gas he purchased from Amoco. The following exchange during the deposition confirms that Geib completely understood that the manipulation of the reports worked to his advantage at Amoco's expense:

> COUNSEL FOR AMOCO: Why would you use the readings from the day before if the price was going down?
>
> GEIB: I didn't always. But if I did, it was within the twenty-four hour period, and it would be in my favor.
>
> COUNSEL: You would always do it so it would be in your favor, if you did it; is that correct?
>
> GEIB: Most likely. I'm not positive.
>
> COUNSEL: It would be in your favor, would it not, to use readings from twenty-four hours before the price change if the price was going down? Would you agree with that?
>
> GEIB: Yes. I'm sorry. Right.
>
> COUNSEL: And that is what you did if you didn't use—if the price was going down and you didn't use the actual readings at the time of the price change, you used them from twenty-four hours before?
>
> GEIB: Most likely, yes.
>
> COUNSEL: And vice-versa: if the price was going up, you would use later readings?
>
> GEIB: Most likely.

Geib Deposition at 89.

■ Geib defends his tactics, despite their apparent impermissibility under the written contract, by arguing that Amoco's oral representations authorized him to submit this type of price change report. At the very least, Geib submits that genuine issues of material fact remain unsettled concerning what he was told by Amoco, and that these factual questions should preclude the grant of summary judgment.

We note initially that the MMP expressly provides that all modifications must be made in writing. But we need not determine the extent to which oral representations are allowed to contradict the written terms of the MMP, because Geib has not identified any representations made by Amoco which could be understood to authorize his meter reading technique. Geib does not allege anywhere in his complaint that Amoco agents directly instructed him to read his meters up to twen-

ty-four hours before or after price changes. Rather, his argument hinges on his own interpretation of two very different instructions he was given by Amoco concerning the mechanics of reporting.

Amoco concedes that Geib was given two oral instructions about reporting. First, he was told that when a price change occurred within twenty-four hours of a regular reporting date, the regular and price change reports could be combined on a single form. To illustrate, recall that Geib's regular reports were submitted on Tuesdays and Fridays. If a price change was announced to take effect on a Monday, and if Geib submitted a proper price change report on Monday, he was not required to complete a regular report on Tuesday, although Tuesday was a regular reporting day. The second oral instruction given to Geib allowed him to read his meters *for the regular reports* at any time during the day he chose. This rule provides dealers with flexibility in the daily operation of their stations, and has no impact whatsoever on the amount Geib pays for gas as long as the price remains constant.

Geib apparently combined these two instructions, ignoring the crucial accounting function performed by the price change reports. When price changes occurred within twenty-four hours of a regular reporting date, Geib frequently submitted a single combined report to Amoco. Then, relying on the rule permitting convenient scheduling of *regular reports,* he decided not to read the meters at the specified time for *price change reports,* although the report would function as both a regular report and a price change report. Instead of completing a proper price change report and submitting it in lieu of a regular report, Geib opted to submit an advantageous regular report in lieu of a price change report. This technique enabled Geib to choose when a price change became effective, and thereby shirk his obligation to pay for gas at the price in effect at the time the gas was drawn from his tanks. Geib can not transform his own opportunistic interpretation of the reporting instructions into a bind-

ing contractual provision nullifying the agreed upon price term in the written agreement. *See Baker v. Amoco Oil Co.,* 956 F.2d 639, 642 (7th Cir.1992) ("dealers cannot vary [the terms of the contract] by establishing an underground network of contrary beliefs and self-serving 'understandings' ").

■ Having determined that Geib breached the price term of the MMP, we are left only to decide if the price term was "both reasonable and of material significance to the franchise relationship." 15 U.S.C § 2802(b)(2)(A). Finding the price term to be entirely reasonable, and finding Geib's efforts to cheat Amoco to be a significant breach, we conclude that Amoco was acting entirely within its contractual rights and without violating the PMPA in refusing to renew Geib's gas franchise. Geib argues that the magnitude of his breach was too insignificant to be an objective justification for nonrenewal. But as the court noted in *Baker v. Amoco, supra,* "[i]n the terms of the [PMPA], the requirement of accurate reporting is 'reasonable', and repeated violations are 'of material significance to the franchise relationship'. Cheating by even a small amount on a contract is significant." 956 F.2d at 642.

■ Geib insists that he always believed his actions were permissible, and that if Amoco was displeased it should have given him a chance to cure his breach. Having no statutory[4] or contractual provisions to rely upon in this regard, Geib argues that Amoco's course of dealing with others led him to believe that he would have an opportunity to cure any breaches he committed. To the contrary, Amoco denies ever permitting a dealer who cheated on his account to pay back the disputed amount. We need not resolve this factual dispute, however, because Geib cites no authority converting an unrelated act of forgiveness into a contractual right in Geib's favor obliging Amoco to continue dealing with him against its will.

■ We also reject Geib's contention that the nonrenewal was untimely under 15

---

4. *See Wisser Co. v. Mobil Oil Corp.,* 730 F.2d 54, 58–59 (2d Cir.1984) (PMPA creates no "right to

cure" material breaches of contract).

**1056**

U.S.C. § 2802(b)(2)(A)(i), which requires that a decision not to renew be made within 120 days of the date of breach. Section 2802 protects franchisees by preventing a franchisor from using a "stale" breach as justification for nonrenewal. Geib urges us to construe § 2802 as prohibiting nonrenewals made more than 120 days after the franchisor's first suspicion of breach. But as the district court properly concluded, the PMPA was not intended to induce Amoco to terminate Geib's franchise summarily upon the first suspicion of wrongdoing. Such "[a]n interpretation of section 2802" would induce "termination based on rumor or suspicion," and thus undermine "the protection from arbitrary and discriminatory terminations that Congress intended." *Nassau Blvd. Shell Serv. Station, Inc. v. Shell Oil Co.*, 875 F.2d 359, 362 (2d Cir.1989). Furthermore, Geib repeatedly breached the MMP, and each new breach provided Amoco with 120 days to terminate the franchise. *See Chevron U.S.A., Inc. v. Finn*, 851 F.2d 1227, 1230 (9th Cir.1988), *cert. denied*, 489 U.S. 1054, 109 S.Ct. 1315, 103 L.Ed.2d 584 (1989). Geib does not deny that at least one incident of misreporting occurred within 120 days of the nonrenewal. Accordingly, the dismissal of Geib's PMPA claim is AFFIRMED.

### III. The MFIL Claim

Geib asserts a claim under Michigan's Franchise Investment Law, seeking to force Amoco to repurchase the automotive service equipment he acquired to operate his Certicare franchise. Under certain circumstances, section 27(d) of the MFIL renders "void and unenforceable" contractual "provision[s] permit[ting] a franchisor to refuse to renew a franchise without fairly compensating the franchisee ... for the fair market value ... of the franchisee's ... equipment." MICH.COMP.LAWS ANN. § 445.1527(d). The district court summarily dismissed Geib's MFIL claim, concluding that the application

of the MFIL to the Certicare franchise was preempted by the PMPA. In the alternative, the district court ruled against Geib on the grounds that the MFIL, which is enforced primarily by the Michigan Attorney General, does not provide for a private right of action. On appeal, Geib challenges both of these rulings.

### A. The Preemptive Scope of the PMPA

■ The MFIL prohibits fraudulent practices in connection with "the offer, sale, and purchase of franchises." *James v. Whirlpool Corp.*, 806 F.Supp. 835, 842 (E.D.Mo.1992). Unlike the PMPA, which applies only to petroleum marketing franchises, 15 U.S.C. § 2801(2), the MFIL is a generic franchise relationship law, which applies to all Michigan franchise agreements without regard to subject matter. MICH.COMP.LAWS ANN. § 445.1504(1). Generic franchise relationship laws like the MFIL address a perceived inequality of bargaining power among the parties to the franchise agreement by providing franchisees with a variety of rights designed to prevent abuses. *See* Pitegoff, *Franchise Relationship Laws: A Minefield for Franchisors*, 45 BUS.LAW. 289, 314 (Nov. 1989).

16 states and the District of Columbia have enacted generic franchise relationship laws. *See* GARNER, FRANCHISE AND DISTRIBUTION LAW AND PRACTICE § 10:01 n. 1 (1990) (collecting statutes). In enacting the PMPA, Congress expressed concern that petroleum franchisors were potentially subject to a maze of varying state regulations because the distribution of motor fuel commonly involves a nationwide network of franchises. To avoid exposing petroleum marketers to inconsistent and unduly burdensome franchise regulation, Congress invoked federal supremacy, U.S. CONST. Art. VI, cl. 2, expressly to preempt state laws which derogate from the PMPA. *See* 15 U.S.C. § 2806(a).[5]

---

5. The PMPA's preemption provision is codified at 15 U.S.C. § 2806(a), which provides:

   To the extent that any provision of this subchapter applies to the termination (or the furnishing of notification with respect thereto) of any franchise, or to the nonrenewal (or the furnishing of notification with respect thereto)

   of any franchise relationship, no State or any political subdivision thereof may adopt, enforce, or continue in effect any provision of any law or regulation (including any remedy or penalty applicable to any violation thereof) with respect to termination (or the furnishing of notification with respect thereto) of any

This preemption represents an effort "[t]o provide certainty and uniformity in franchise relationships which permeate a nationwide motor fuel distribution and marketing network." S.REP. No. 95-731, 95th Cong., 2d Sess. 16 (1978), *reprinted in* 1978 U.S.C.C.A.N. 873, 874.

It is beyond question that Congress may remove segments of interstate commerce from the scope of state legislative power. *See, e.g., FMC Corp. v. Holliday*, 498 U.S. 52, 56–57, 111 S.Ct. 403, 406–07, 112 L.Ed.2d 356 (1990); *Louisiana Public Serv. Comm'n v. FCC*, 476 U.S. 355, 368–69, 106 S.Ct. 1890, 1898–99, 90 L.Ed.2d 369 (1986); *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152–53, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982). To "determin[e] whether federal law pre-empts a state statute, we look to congressional intent." *FMC Corp.*, 498 U.S. at 56, 111 S.Ct. at 407. Thus, the question before us today is whether Congress wanted the PMPA to govern Geib's Certicare Agreement to the exclusion of any state regulation.

■ Section 2806(a) of the PMPA, *supra* note 5, provides a clear textual expression of Congress' preemptive intent. By forbidding enforcement of any provision of state law "with respect to termination" of a motor fuel sales franchise, the language of section 2806(a) indicates that the appropriateness of preemption in any particular case depends upon two factors. First, a court must conclude that the challenged state law applies to a motor fuel sales franchise. State laws which have no application in the context of motor fuel sales are not preempted by the PMPA. *See Smith v. Atlantic Richfield Co.*, 533 F.Supp. 264, 267 (E.D.Pa.1982), *aff'd*, 692 F.2d 749 (3d Cir.1982) (no preemption of state franchise law as applied to convenience store franchise). Secondly, the court must ascertain whether the challenged law regulates an aspect of the franchise relationship pertaining to termination. State laws having no impact on the termination of franchise agreements are also not preempted by the PMPA. *See Esso Standard Oil Co. v. De-*

*partment of Consumer Affairs*, 793 F.2d 431, 434–36 (1st Cir.1986) (no preemption of state rent control law as applied to gas franchise).

■ If Geib's MFIL claim sought to challenge the nonrenewal of his Dealer Supply Agreement, the argument favoring preemption would be strong, because 15 U.S.C. § 2806 prohibits Michigan from regulating the nonrenewal of a gas franchise. *Consumers Petroleum Co. v. Texaco, Inc.*, 804 F.2d 907, 915–16 (6th Cir.1986). But Geib's MFIL claim is based solely upon the termination of his Certicare franchise, which by its own terms "pertains exclusively to [Geib]'s automotive maintenance and repair service business." Geib argues, and we agree, that an MFIL claim based upon the termination of the Certicare franchise does not fall within the PMPA's preemptive grasp, because the Certicare franchise does not involve the sale of motor fuel. Amoco has identified no provision of the PMPA, no portion of its legislative history, and no appellate precedent which would justify the extension of exclusive federal regulation to automobile repair franchises. To the contrary, the PMPA expressly preserves state discretion to regulate non-gas franchises. Section 2806(a) only preempts state franchise law "to the extent that any provision of [the PMPA] applies" to a disputed franchise termination. Since the PMPA only regulates the termination of "motor fuel marketing" franchises, 15 U.S.C. § 2801(2), the termination of a non-gas franchise does not implicate its preemption clause. As the legislative history explains, "[t]o the extent that the provisions of [the PMPA] do not apply to an aspect of the franchise relationship, State laws dealing with such aspects of the relationship are not preempted." S.REP. No. 731 at 42, 1978 U.S.C.C.A.N. at 900.

The district court provided the following justification for its finding that Geib's automotive service franchise was governed by the PMPA:

It appears to the Court that the provisions of the Michigan franchise law have indeed been preempted by the PMPA un-

such franchise or to the nonrenewal (or the furnishing of notification with respect thereto) of any such franchise relationship unless such

provision of such law or regulation is the same as the applicable provision of this subchapter.

der the circumstances of this case. The franchise agreement is integrally related to the PMPA agreement, and the terms of the PMPA would be infringed upon by application of plaintiff's interpretation of the franchise law, the Michigan franchise law.

The district court's reasoning seems to follow *Atlantic Richfield Co. v. Brown,* Bus. Franchise Guide (CCH) ¶ 8455, at 15,798 (N.D.Ill.1985). In that case, the PMPA was found to preempt the application of Illinois franchise law to a convenience store franchise because the store was operated on the same premises as a gas franchise. Without offering any textual, historical, or precedential justification, the *Atlantic Richfield* court declared that the PMPA governs any non-gas franchise which is "inextricably linked" to a gas franchise. *Id.* at 15,803. The inextricable link in *Atlantic Richfield* was the sharing of a single parcel of real estate for the operation for both franchises. The *Atlantic Richfield* court defended its unprecedented ruling on the grounds that any state regulation of the convenience store franchise threatened indirectly to undermine exclusive federal regulation of the gas franchise. *Id.*

■ We decline to follow the *Atlantic Richfield* court's extension of exclusive federal regulation to non-gas franchises. The *Atlantic Richfield* court's reasoning has not been embraced by any court of appeals, and we find it unpersuasive for several reasons. First, a healthy respect for state legislative prerogatives cautions against the expansive construction of preemptive provisions. When Congress enters "a field which the States have traditionally occupied," we "assum[e] that the historic police powers of the States were not to be superseded" unless we are convinced that such preemption was "the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947); *Darling v. Mobil Oil Corp.,* 864 F.2d 981, 986 (2d Cir.1989) (explaining that a finding of preemption under the PMPA "should be reached in a careful and judicious manner to avoid unwarranted disruption of important state policies").

■ Our second reason for rejecting the rule of *Atlantic Richfield* is a textual one: 15 U.S.C. § 2801(2) expressly restricts the scope of PMPA regulation to "motor fuel marketing" franchises. We construe statutory terms according to their ordinary meanings, *Richards v. United States,* 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962), and the phrase "motor fuel marketing franchise" plainly does not describe an automotive service franchise, or any other non-gas franchise for that matter.

Thirdly, we hesitate to disregard Congress' clear delineation of the types of state laws preempted by the PMPA. "By specifying with such precision when the states must stand aside in favor of federal regulation, Congress implicitly marked out the bounds of the power it intended to exercise." *Exxon Corp. v. Georgia Ass'n of Petroleum Retailers,* 484 F.Supp. 1008, 1017 (N.D. Ga.1979), *aff'd,* 644 F.2d 1030 (5th Cir.), *cert. denied,* 454 U.S. 932, 102 S.Ct. 430, 70 L.Ed.2d 239 (1981); *Esso Standard, supra,* 793 F.2d at 434. To find preemption "in areas that Congress left to the control of the states" would frustrate the will of Congress. *Bellmore v. Mobil Oil Corp.,* 783 F.2d 300, 305 (2d Cir. 1986).

Finally, we fail to see how the PMPA is undermined by a requirement that Amoco repurchase equipment acquired by Geib to operate the Certicare franchise. The repurchase provision does not seek to penalize Amoco for terminating the franchise—it simply seeks to compensate Geib for an investment made at Amoco's prompting, probably in anticipation of a longer tenure as a Certicare franchisee. In marked contrast to a penalty which presumably would target only bad faith terminations, section 27(d) would subject all franchisors to the repurchase requirement, without regard to their reason for terminating the franchise. As the *Bellmore* court explained while upholding a similar state law requiring franchisors to repurchase good will:

We cannot accept [the franchisor]'s argument that the payment of good will is a remedy or penalty for termination and thus preempted.... The good will por-

tion of the Connecticut Act is no more than a recognition of the good will value that [the franchisor] would otherwise receive because of the effort of the deposed franchisee.... The payment of good will is mandated by [the state] simply as one element of the compensation to be paid on termination, an element [the state] expressly considers worthy of compensation if there had not been a sufficiently long period (one year) in which to recoup that good will.

783 F.2d at 305 (citation omitted). Accordingly, we do not agree with the district court that Geib's MFIL claim is preempted by the PMPA.

## B. The MFIL's Private Right of Action

■ Geib challenges the district court's ruling that section 27 of the MFIL, MICH. COMP.LAWS ANN. § 445.1527, does not authorize private actions for damages. This ruling, in contrast with the PMPA analysis, does not implicate any federal law, and jurisdiction in this court "solely rest[s] on the fact that [the] plaintiff and [the] defendant are citizens of different States." *Lumbermen's Mut. Casualty Co. v. Elbert,* 348 U.S. 48, 54, 75 S.Ct. 151, 155, 99 L.Ed. 59 (1954) (Frankfurter, J., concurring).

Although the MFIL plays an important role in the regulation of franchise relationships in Michigan, no state court has yet had an opportunity to determine whether section 27 creates private rights of action. However, section 27 claims have now been asserted twice in federal litigation involving Michigan franchises. In the first federal interpretation of section 27, *General Aviation, Inc. v. Cessna Aircraft Co.,* 915 F.2d 1038, 1044 (6th Cir.1990), the court allowed an action for damages to proceed after concluding that private rights of action had been authorized by certain MFIL amendments in 1984.[6]

The *Cessna* court began its analysis by examining the text of section 27 as initially enacted in 1974. The court explained that section 27 originally prevented franchisors from adopting certain unduly advantageous

franchise provisions through an elaborate scheme of prospectus registration, which required the filing of all franchise offerings with the Michigan Department of Commerce. By empowering the Department to "prohibit any registration from becoming effective" if the prospectus contained any of the provisions listed in section 27, the MFIL used prospectus registration to remove undesirable terms from franchise agreements. 915 F.2d at 1044. In light of this complex enforcement scheme, the *Cessna* court concluded that the original text of section 27 "does not by its terms provide for a private right of action by the franchisee." *Id.*

The *Cessna* court continued its analysis by discussing the 1984 MFIL amendments, which were primarily designed to abolish the prospectus registration system—a system widely considered both cumbersome and ineffective. Several historical documents express the broad consensus among proponents of reform that the elimination of prospectus registration would alleviate the burden upon franchisors without increasing the risk to franchisees. The report of the Legislative Analysis Section of the Michigan House of Representatives explains the motivation for amending the MFIL in 1984:

Many reputable franchisors have decided that doing business in Michigan is more trouble than it is worth, pointing out that the required paperwork is at times ridiculously extensive and time-consuming, and state regulators are sometimes inconsistent in their application of the law. Moreover, a decade of experience has shown that the act is of little use against the shady operators who were of greatest concern: such types did not register anyway.

Last summer, representatives from the governor's office, the attorney general, the commerce department, the Consumers Council, and various franchisors began developing an alternative approach to franchise regulation in Michigan. It was generally agreed that prospective franchisees could be adequately protected through franchisor disclosures and a strong state

---

6. Enacted by 1974 Mich.Pub. Act No. 269, the MFIL was amended ten years later by 1984

Mich.Pub. Act No. 92.

# 1060

enforcement capability; many of the act's requirements for submitting information to the state were superfluous and could safely be replaced with a simple filing requirement. House Bill 5119 is the result.

MICH. HOUSE LEGIS. ANALYSIS, H.B. 5118 & 5119, at 1 (July 17, 1984).[7]

Having abolished prospectus registration, the MFIL lost its primary mechanism for removing undesirable terms from franchise agreements. To provide franchisees with new protection, the text of section 27 was revised to declare the listed provisions "void and unenforceable if contained in any documents relating to a franchise." MICH.COMP. LAWS ANN. § 445.1527. According to the *Cessna* court, the insertion of this phrase— "void and unenforceable"—in 1984, as a replacement for prospectus registration, authorized private rights of action under section 27:

> Apparently no concerted effort was made to enforce the 1974 Act, and in 1984 it was amended to make the four statutory prohibitions [in section 27] more effective by making any franchise contract provisions in violation thereof "void and unenforceable," § 445.1527, thereby creating private rights of action for their violation.

915 F.2d at 1044.

No Michigan court has addressed the viability of private actions under section 27 since *Cessna* was decided. The ruling of the district court below is the second federal interpretation of section 27, and that court's independent review yielded a conclusion substantially at odds with *Cessna*. Explaining that "this cause of action is not provided by th[e] statute," the district court dismissed Geib's MFIL claim. The district court apparently placed great emphasis on the text of MFIL section 34, which instructs courts not to imply private rights of action:

> Except as explicitly provided in this act, civil liability in favor of any private party shall not arise against a person by implication from or as a result of the violation of a provision of this act or a rule or order hereunder.

MICH.COMP.LAWS ANN. § 445.1534.

The direct conflict between these interpretations of Michigan law within the federal court system, viewed in conjunction with the substantiality of the competing arguments, suggests that this matter can most authoritatively be resolved by the Supreme Court of Michigan, which bears ultimate responsibility for reconciling that state's competing policy interests. Franchise agreements often cross state borders, and the resulting diversity of citizenship draws many franchise disputes into a federal tribunal, notwithstanding the presence of state law claims. As a consequence, we perceive a very real danger that Michigan's courts will be denied any meaningful participation in the interpretation of section 27.

In light of the likelihood that section 27 claims will recur in federal litigation, without an opportunity for Michigan courts to determine whether that provision authorizes private actions, we certify this question to the Supreme Court of Michigan. We believe that judicious resort to the technique of certification in situations such as this, where an important question of state law has arisen solely in federal court, "prevent[s] federal

---

7. *See also* May & Steinberg, *Great Expectations: 1984 Amendments to the Michigan Franchise Investment Law*, 64 Mich.B.J. 32, 32 (Jan.1985) (MFIL "was amended to eliminate the disincentives associated with the registration process, while increasing protection for the franchisee"); *Michigan Amends Franchise Law, Eases Requirements for Entry of Franchisors*, ANTITRUST & TRADE REG.REP. (BNA), Vol. 47, at 173 (July 26, 1984) ("The decision to amend the state's franchise law was the result of a study by the Michigan Commission on Jobs and Economic Development, which was formed to determine how the state should improve its economic climate."); *Capital News Briefs*, UPI, Aug. 21, 1984, *available in* LEXIS, Nexis library, UPI file ("64 new franchise

operations have registered in Michigan since a new law streamlining regulations took effect six weeks ago. The law eliminated the lengthy disclosure requirements, while empowering the attorney general to monitor franchising to assure that franchisees are protected."); Rankin, *Proposed Legislation in Michigan May Spell Relief for Franchisors*, NATION'S RESTAURANT NEWS, Vol. 17, at 6 (Dec. 5, 1983) ("In a statement introducing his new 'Franchise Investment Law Reform Act,' [Governor James] Blanchard said relief from the state's burdensome registration and escrow requirements was necessary to correct 'a perception among franchisors that Michigan was an unfavorable state in which to operate.' ").

invasion of the state law-making function and [avoids] needless federal-state friction." Note, *Inter–Jurisdictional Certification: Beyond Abstention Toward Cooperative Judicial Federalism*, 111 U.Pa.L.Rev. 344, 350 (1963). Indeed, the Supreme Court has recommended that we use certification to address "the problem of authoritatively determining unresolved state law involved in federal litigation." *Clay v. Sun Ins. Office Ltd.*, 363 U.S. 207, 212, 80 S.Ct. 1222, 1226, 4 L.Ed.2d 1170 (1960). By certifying the MFIL question before us today, we not only "avoid the hazards of attempting to forecast how [Michigan] courts might rule," but we also "afford the [Supreme Court of Michigan] the opportunity to address a not insubstantial issue under the law of that State." *Lee v. Wheeler*, 810 F.2d 303, 306 (D.C.Cir.1987). Certification also "saves time, energy, and resources and helps build a cooperative judicial federalism." *Toner v. Lederle Labs.*, 779 F.2d 1429, 1432 (9th Cir.1986) (Kennedy, J.).

Pending the outcome of the request for a ruling on the certified question, we reserve judgment on the district court's dismissal of Geib's MFIL claim. To avoid any perceived need to file a protective petition for *certiorari* regarding the issues decided elsewhere in this opinion, we retain jurisdiction over this entire controversy, and no final judgment shall enter until we resolve the MFIL issues, "presumably upon receipt and consideration of any action by the Supreme Court of [Michigan]" in response to our certified question. *Firestone v. Galbreath*, 976 F.2d 279, 288 (6th Cir.1992).

## IV. The Common Law Claims

■ Pursuant to the Certicare program, Geib and Amoco contracted with National Data Systems to compile a list of Geib's Certicare customers for the purpose of mailing automotive service advertisements. Geib alleges that Amoco promised to use the customer list exclusively for his benefit and to keep the list confidential. After Geib's franchise ended, Amoco continued to mail automotive service advertisements to these Certi-

care customers. Geib claims that this solicitation of business breached Amoco's verbal assurances of confidentiality. He also claims that the alleged promise of confidentiality amounts to fraudulent misrepresentation.

The Certicare Agreement makes no provision for the confidentiality of the customer list. In fact, the written contract expressly grants Amoco access to Geib's Certicare records for promotional purposes.[8] Consequently, Geib relies on oral promises of confidentiality allegedly made by Amoco. However, as the district court properly concluded, even if Geib's allegations are fully credited, he has not identified any written or oral representations purporting to limit the use of the lists *after* the termination of the franchise:

> The plaintiff and the defendant did not have a binding agreement not to use the customers' names for any purpose after the conclusion of the plaintiff's tenancy in the station, and the plaintiff has also admitted in his deposition that no assurances were made to him that the names would not be utilized after separation of the parties.

The only provision pertaining to post-termination use of the list works decidedly in Amoco's favor, providing that "[u]pon expiration or termination of the License or this Agreement for any reason whatsoever, all rights herein granted the Dealer shall thereupon revert to Amoco...." Since Geib has not identified any plausible right to confidentiality after the expiration of the Certicare franchise, his actions for breach of contract and fraudulent misrepresentation are meritless.

■ Geib also asserts a claim for tortious interference with business relations, arising out of Amoco's mailing of advertisements to his former Certicare customers. But Geib has failed to make the required preliminary showing that he had an expectancy of future business relations with these customers with which Amoco might possibly have interfered.

8. The Certicare Agreement entitles Amoco "at its option, to inspect [Geib's] location, activities, and records at all reasonable times for purposes in legitimate furtherance of [the Certicare] Agreement and the development of the CERTICARE program and of customer good will related thereto."

See *Michigan Podiatric Medical Ass'n v. National Foot Care Program, Inc.*, 175 Mich. App. 723, 438 N.W.2d 349, 354 (1989). As explained above, any expectation Geib had of future dealings with his former customers did not survive the termination of his Certicare franchise.

For the foregoing reasons, the judgment of the district court dismissing Geib's federal statutory claim and state common law claims is AFFIRMED.