NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports.  Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

———————————————

Merrimack
No. 2017-0714


TS & A MOTORS, LLC d/b/a KIA OF SOMERSWORTH

v.

KIA MOTORS AMERICA, INC.

Argued:  November 13, 2018
Opinion Issued:  March 29, 2019


Law Office of Joshua L. Gordon, of Concord (Joshua L. Gordon on the brief and orally), for the appellant.


Nixon Peabody LLP, of Manchester (Kevin M. Fitzgerald and Nathan P. Warecki on the brief), and Hogan Lovells US LLP, of Washington, D.C. (Catherine E. Stetson and Kirti Datla on the brief, and Ms. Stetson orally), for the appellee.


LYNN, C.J.  The appellant, TS & A Motors, LLC d/b/a Kia of Somersworth (Somersworth), appeals a decision of the Superior Court (McNamara, J.) affirming an order of the New Hampshire Motor Vehicle Industry Board (the Board) ruling that the appellee, Kia Motors America, Inc. (Kia), properly terminated its franchise agreement with Somersworth pursuant to RSA 357-C:7 (Supp. 2018).  We affirm.

The following facts are drawn from the trial court's order, or are otherwise supported by the record and undisputed on appeal. In December 2007, Kia and Somersworth entered into a Dealer Sales and Service Agreement (Dealer Agreement), which governed the franchise relationship between the parties. Under this agreement, Somersworth is required to employ certain parts and service personnel. Specifically, the agreement provides:

> DEALER shall employ and train a sufficient number of competent personnel of good character, including one or more persons who will function as sales manager, service manager and parts manager, sales persons, service technicians and parts personnel to fulfill all of DEALER'S responsibilities under this Agreement and as recommended by COMPANY, and shall cause such personnel to attend such training schools as COMPANY may from time to time require at DEALER'S sole expense.

Dealer Agreement § IV.A.4.

Subsequently, between March 2011 and March 2012, Kia sent a series of letters notifying Somersworth of perceived staffing and training deficiencies. These letters referenced Somersworth's failure to meet technician training requirements in 2009 and 2010, to adequately staff and train personnel in its parts and service department, and to meet the minimum number of technicians required to participate in Kia's "Optima Hybrid Program." During Somersworth's tenure as a dealer, Kia employees overseeing Somersworth made note of its high employee turnover rates. The Board determined that over the course of its operations as a dealer, Somersworth violated the provision of the Dealer Agreement that required certain parts and service personnel "on an almost constant basis." Kia management worked with Somersworth to remedy its staffing deficiencies. It sent numerous written notifications to Somersworth referencing the inadequacy of its parts and service staffing, met with Somersworth to discuss its concerns over staffing, and gave Somersworth the "benefit of the doubt" when the dealer promised to hire the appropriate number of staff members.

Finally, on November 6, 2014, Kia sent formal notice to Somersworth of its failure to employ a minimally adequate parts and service staff, as required under the Dealer Agreement. At the time this letter was sent, Somersworth was operating without a service manager, service advisor/service consultant, or parts-counter person; all positions mandated by the Dealer Agreement. The November 6 letter provided a 60-day period to cure the staffing breach; however, Somersworth continued to function without the requisite staff. In light of Somersworth's continued failure to cure its staffing issues, on or about February 23, 2015, Kia notified Somersworth that, effective 90 days from

receipt of the letter, its Dealer Agreement with Kia would terminate. At the time the termination letter was sent, Somersworth did not have a single position filled in its parts and service department that was required under the Dealer Agreement.

Somersworth protested its termination before the Board, arguing that there was insufficient evidence of statutory good cause on the part of Kia to terminate the agreement. See RSA 357-C:7, I(c). Specifically, Somersworth argued that "[d]ue to an unprecedented tight labor market for automobile service workers in the Seacoast area, . . . it was unable to hire the workers required under the dealer agreement," and thus "it was not reasonably possible for it to comply with the staffing requirements." In an order dated May 10, 2017, the Board denied Somersworth's termination protest.

On May 26, 2017, Somersworth filed an application for rehearing on the grounds that the Board erred in finding that Kia had sent the termination letter within 180 days of first obtaining knowledge of Somersworth's staffing issues, as required by RSA 357-C:7, II(a). In support of its request for rehearing, Somersworth attached the 2011 and 2012 communications from Kia, which, it argued, proved that Kia had actual knowledge of Somersworth's deficiency in staffing its parts and service department "well over 180 days prior to the notice of termination." Somersworth also pointed to testimony, relied on by the Board in its initial order, that it believed indicated that employees of Kia had knowledge of the staffing breach for more than 180 days preceding Kia's sending of the termination letter.

The Board denied Somersworth's request for rehearing and found "that the notice was proper because of the continuing nature of the staffing problems." In so doing, the Board stated that "[i]t would be contrary to the intent of the dealer statute to require a manufacturer to initiate a termination action by sending a termination letter at the first technical breach of the dealer agreement." The Board also noted that "Kia expended tremendous effort in order to correct the breach and avoid a termination," and it was "[o]nly after these efforts had failed and the breach rose to a critical level" that Kia sent its termination letter.

Somersworth appealed to the superior court, and on November 15, 2017, the superior court affirmed the Board's order. The trial court ruled that the Board's interpretation of RSA 357-C:7 was consistent with the plain language of the statute. Relying on state and federal cases, the court concluded that "[e]ach day that Somersworth was out of compliance with the Dealer Agreement's staffing requirements constituted a new violation of that agreement." The court reasoned that adopting Somersworth's argument would mean requiring a manufacturer to terminate a franchise agreement at the first sign of breach, without providing a dealer with the opportunity to remedy the infraction, a construction the court found inconsistent with the statute's

3

purpose "to protect dealers from oppressive conduct by manufacturers."  This appeal followed.

## II

The trial court's review of the Board's decision is governed by RSA 357-C:12, VII (2009).  Mahindra & Mahindra v. Holloway Motor Cars of Manchester, 166 N.H. 740, 745 (2014).  Pursuant to this statute, all findings of fact by the Board "shall be prima facie lawful and reasonable."  RSA 357-C:12, VII.  "No additional evidence shall be heard or taken by the superior court on appeals from the board," and the "decision appealed from shall not be set aside or vacated except for errors of law."  Id.  Our review of the trial court's decision is similarly limited, and we will not overturn the trial court unless a legal error has been made.  Mahindra & Mahindra, 166 N.H. at 745.  In conducting our analysis, we review the trial court's statutory interpretation de novo.  Strike Four v. Nissan N. Am., 164 N.H. 729, 735 (2013).

RSA chapter 357-C, "the so-called 'dealer bill of rights,'" was enacted in 1981.  STIHL, Inc. v. State of N.H., 168 N.H. 332, 333 (2015).  It governs the relationship between automobile manufacturers and their dealers.  See Roberts v. General Motors Corp., 138 N.H. 532, 534 (1994).  In 1996, the legislature created the New Hampshire Motor Vehicle Industry Board to enforce RSA chapter 357-C.  STIHL, Inc., 168 N.H. at 333.  Like similar statutes in other states, RSA chapter 357-C was enacted by the legislature "to protect retail car dealers from perceived abusive and oppressive acts by the manufacturers."  Deere & Co. v. State of N.H., 168 N.H. 460, 466-67 (2015) (quotation omitted); see also Roberts, 138 N.H. at 536.

RSA chapter 357-C mandates, among other requirements, that a manufacturer have "good cause" to terminate a franchise agreement.  RSA 357-C:7, I(c).  Good cause exists when: (1) there is a failure by the dealer to comply with a provision of the franchise agreement that is "reasonable and of material significance to the franchise relationship," provided compliance on the part of the dealer is "reasonably possible"; and (2) the manufacturer "first acquired actual or constructive knowledge of such failure not more than 180 days prior to the date on which notification" of termination is given.  RSA 357-C:7, II(a) (emphasis added).

On appeal, Somersworth argues that Kia did not comply with the statutory "good cause" requirements, and in particular the 180-day look-back period, because it had knowledge of Somersworth's staffing breach as early as March 2011 — years before Kia's February 2015 termination letter.  Somersworth contends that the plain language of RSA 357-C:7, II(a) supports this position, as commencement of the statute's notification period turns on the date the manufacturer "first acquired . . . knowledge" of the breach.

Kia, on the other hand, contends that the phrase "such failure" assigns the 180-day requirement to the specific failure on which the termination was based. Kia argues that the breach that triggered the termination — and thus, the only breach relevant to the look-back period — occurred sometime between October 2014 and February 2015, and marked the "last straw" for Kia "after a series of breaches of the Dealer Agreement." In addition, Kia asserts that the earlier staffing issues identified by Kia in its 2011 and 2012 letters were irrelevant "because they either did not involve the Dealer Agreement, did not involve staffing, were cured before Kia sent its termination notice, or involved some combination of these circumstances."

The issue before us is a matter of statutory construction, and thus we must begin our analysis by considering the plain meaning of the words of the statute. Roberts, 138 N.H. at 535-36. In so doing, we will focus on the statute as a whole, not on isolated words or phrases. Id. at 536.

In analyzing the disputed statutory language within its context, we are persuaded by Kia's interpretation. See id. at 535-36. While Somersworth would have us concentrate exclusively on the use of the word "first" in RSA 357-C:7, II(a), Kia's analysis focuses on the statute as a whole. See id. We conclude that, when read in its entirety, the 180-day look-back provision mandates that a manufacturer first acquire knowledge of the failure on which its termination is based no more than 180 days prior to the date on which it provides the dealer with notice of termination. See RSA 357-C:7, II(a). Moreover, after review of the record, we are persuaded that where similar breaches occur both before and during a statutory look-back period, each day a dealer is in breach is a new "failure" on which a manufacturer's termination may be based. See RSA 357-C:7, II(a).

The Board found that prior to Kia's November 2014 cure letter, Somersworth's parts and service department was a revolving-door workplace with unprecedented turnover rates. In a statement of material facts filed with the Board before the hearing, the parties stipulated that during the six-month period prior to receiving Kia's cure letter, Somersworth had four different parts managers. Furthermore, in testimony provided at the hearing, Kia employees responsible for overseeing Somersworth's operations stated that they observed staff being hired and then leaving very quickly. The Board concluded that the evidence demonstrated a complete inability on the part of Somersworth to employ staff, as well as to retain staff once hired.

The Board also found that prior to sending its cure letter and termination notice, Kia had worked with Somersworth to remedy its staffing deficiencies. Specifically, Kia's former regional director testified regarding his extensive efforts to remedy Somersworth's staffing deficiencies in its parts and service department. However, these efforts went for naught. The Board found that, when Kia's cure letter was sent in November 2014, Somersworth was without a

service manager, a service advisor/service consultant, and a parts-counter person.  The Board further found that three months later, when the termination notice was delivered, Somersworth did not have a single position filled in its parts and service department.

The Board's factual findings support the conclusion that the staffing breach that was occurring at Somersworth between August 2014 and February 2015 was separate from any breach Kia may have been aware of in 2011 and 2012.  Importantly, consistent with the Board's findings that Somersworth's parts and service department was in an ongoing state of employee turnover, the record indicates that Somersworth's violations of the Dealership Agreement were distinct, each involving different individuals and unique staffing inadequacies.  Thus, the failure on which Kia's termination letter was based was not the same as any failure of which it had knowledge prior to the statutory look-back period.

The Supreme Court of Alabama's interpretation of a similar statute supports our analysis.  See Estate of Gordon-Couture v. Brown, 152 N.H. 265, 273 (2005) (looking to similar statutes from other jurisdictions for guidance).  Like our statute, the Alabama Motor Vehicle Franchise Act, see Ala. Code §§ 8-20-1 to 8-20-14 (1975), prescribes a 180-day look-back period within which a manufacturer must first acquire knowledge of a dealer's breach prior to sending notice of termination.  Ala. Code § 8-20-5(b)(1).  In Smith's Sports Cycles v. American Suzuki, 82 So. 3d 682 (Ala. 2011), the Supreme Court of Alabama addressed whether a manufacturer's knowledge of a dealer's breach, prior to the start of the requisite 180-day look-back period, foreclosed the manufacturer from terminating the franchise agreement.  Smith's Sports Cycles, 82 So. 3d at 687, 689.  In concluding that it did not, the court focused on the "evolving and continuous" nature of the dealer's breach — the failure to maintain the appearance of the dealership facility.  Id.  The court explained that the facility was already "deteriorating" in 2001, "continued to deteriorate" until 2008, and "got progressively worse from 2005 through 2006," despite efforts from the manufacturer to work with the dealer to comply with the franchise agreement.  Id.  In determining that the manufacturer could lawfully terminate the franchise relationship, the court stated that "[t]o hold otherwise would allow [the dealer] to continue to operate the dealership in a manner inconsistent with, and in violation of, the franchise agreement."  Id.

In Smith's Sports Cycles, the Supreme Court of Alabama relied on federal cases interpreting the Petroleum Marketing Practices Act (PMPA), see 15 U.S.C. §§ 2801-2841 (2012), a federal statute with similar notice provisions, including a requirement that a franchisor first acquire knowledge of a breach not more than 120 days prior to the date on which notification of termination is given.  Smith's Sports Cycles, 82 So. 3d at 688-89; see 15 U.S.C. § 2802(b)(2)(A)(i).  These federal cases also support our conclusion.  See, e.g., Geib v. Amoco Oil Co., 29 F.3d 1050, 1055-56 (6th Cir. 1994); Gruber v. Mobil Oil Corp., 570 F.

6

Supp. 1088, 1092 (E.D. Mich. 1983); <u>Walters v. Chevron U. S. A., Inc.</u>, 476 F. Supp. 353, 356-57 (N.D. Ga. 1979). <u>Geib</u>, <u>Gruber</u>, and <u>Walters</u> all deal with circumstances where there were repeated failures to comply on the part of the franchisee, both within and outside of the statutory look-back period. <u>See</u> <u>Geib</u>, 29 F.3d at 1056; <u>Gruber</u>, 570 F. Supp. at 1092; <u>Walters</u>, 476 F. Supp. at 356-57. The courts emphasized that the legislative purpose of the PMPA's 120-day time limitation is to guard against franchisors basing termination on stale breaches and "old and long forgotten events." <u>Geib</u>, 29 F.3d at 1056; <u>see</u> <u>Gruber</u>, 570 F. Supp. at 1092; <u>Walters</u>, 476 F. Supp. at 357. To effectuate the legislative intent of the statute, these courts determined that the PMPA permits the franchisor to treat each of the franchisee's breaches as a new and independent ground on which termination of the franchise relationship may be based. <u>See</u> <u>Geib</u>, 29 F.3d at 1056; <u>Gruber</u>, 570 F. Supp. at 1092; <u>Walters</u>, 476 F. Supp. at 356-57.

In addition, in interpreting the look-back provision of the PMPA, federal courts have elucidated that the provision "aims to prevent franchisors from basing termination upon old and long forgotten events while still giving the franchisor adequate time to evaluate the events or to work with the franchisee to correct the situation." <u>Rao v. BP Products North America, Inc.</u>, 589 F.3d 389, 396 (7th Cir. 2009) (quotation omitted). These courts have explained that "the PMPA was not intended to induce [a manufacturer] to terminate [a] franchise] summarily upon the first suspicion of wrongdoing." <u>Geib</u>, 29 F.3d at 1056 (6th Cir. 1994); <u>accord</u> <u>Rao</u>, 589 F.3d at 397 ("[T]he PMPA does not necessarily require a franchisor to give notice of termination upon the first hint that something might be amiss."). Indeed, the "overriding purpose" of the PMPA is to establish "protection for franchisees from arbitrary and discriminatory terminations or nonrenewals." <u>Nassau Blvd. Shell Service v. Shell Oil Co.</u>, 875 F.2d 359, 362 (2d Cir. 1989) (citation omitted); S. Rep. No. 95-731, at 15 (1978), <u>reprinted in</u> 1978 U.S.C.C.A.N. 873, 874. We find these federal cases instructive.

Our conclusion today is further supported by the statute's purpose. <u>Bovaird v. N.H. Dep't of Admin. Servs.</u>, 166 N.H 755, 759 (2014) (noting that when interpreting a statute, "[w]e seek to effectuate the overall legislative purpose and to avoid an absurd or unjust result" (quotation omitted)). In enacting RSA chapter 357-C, the legislature recognized "that the distribution and sale of vehicles within this state vitally affects the general economy of the state and the public interest and welfare," and thus set out to "prevent frauds, impositions, and other abuses and to protect and preserve the investments and properties of the citizens of this state." Laws 1981, 477:1. As we have previously stated, "chapter 357-C is a comprehensive statute governing the relationships between automobile manufacturers and their dealers. The clear intent of the non-consumer-oriented provisions is to protect the investment and property interests of those who are already dealers." <u>Roberts</u>, 138 N.H. at 536.

Adopting Somersworth's interpretation of RSA 357-C:7, II(a) would undermine the statute's purpose and lead to absurd results.  While the legislature intended for the statute to protect dealers, Somersworth's reading of the statute would result in harm to dealers, as it encourages manufacturers to terminate a franchise relationship as soon as they learn of a dealer's breach, rather than working with that dealer to remedy the breach without termination.  To be sure, the "investment and property interests" of dealers are better protected when manufacturers are able to assist in remedying a breach without fear of losing their rights, as this helps ensure that franchises are not prematurely terminated.  Roberts, 138 N.H. at 536.  In addition, Somersworth's interpretation would likely result in manufacturers facing difficulties terminating franchise agreements based on new breaches, simply because similar stale breaches have occurred in the past.  Finally, it would be incongruous at best for the statute to reward dealers who repeatedly violate a franchise agreement while punishing manufacturers for their tolerance.  See Nassau Blvd. Shell Service, 875 F.2d at 363 (stating that the PMPA seeks to "encourage prudence and patience in approaching franchise terminations").

For the foregoing reasons, we affirm the trial court's order upholding the Board's ruling.

Affirmed.

HICKS, HANTZ MARCONI, and DONOVAN, JJ., concurred.